**Jill K. MASSIE, as Mother and Next Friend of Autumn Massie, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 95–330C.

United States Court of Federal Claims.

Dec. 23, 1997.

R. Gordon Pate, Pate, Lewis, Lloyd & Fuston, Birmingham, AL, attorney of record for Plaintiff.

Luis M. Matos, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were David M. Cohen, Director, and Assistant Attorney General, attorneys of record for Defendant.

## OPINION

HORN, Judge.

The above-captioned case is presently before this court on summary judgment. Previously, the defendant filed a motion to dismiss for lack of jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC). In 1983, plaintiff, Jill K. Massie, as mother and next friend of Autumn Massie, a minor, filed a claim with the United States Department of the Navy for personal injury occurring at the time of Autumn Massie's birth in a Naval Hospital in Naples, Italy, pursuant to the Military Claims Act, 10 U.S.C. § 2733 (1982). As a result of the claim, the parties entered into a settlement agreement by which the United States agreed to purchase an annuity that would provide structured payments to Ms. Massie. Ms. Massie claims that the United States breached the settlement agreement because the amount of the annuity and structured payment products has decreased as a result of the restructuring of the insurance company administering the annuity in favor of the Massies, and that, therefore, the payments have not been made as agreed upon by the parties.

Defendant filed a motion to dismiss for lack of subject matter jurisdiction alleging that a claim for breach of a settlement agreement arising from a claim pursuant to section 2733 of the Military Claims Act is not within the jurisdiction of this court. Plaintiff responded that the lawsuit was filed to enforce the settlement agreement which, according to the plaintiff, operates as a contract be-

tween the plaintiff and the United States, and not to request review of the underlying decision of the Secretary of the Navy to enter into that settlement agreement or regarding the propriety of that agreement pursuant to the Military Claims Act. After briefing and oral argument on the motion to dismiss, the court issued an unpublished order on September 30, 1996. The contents of the order on the motion to dismiss are incorporated into the instant opinion. The court ruled that the settlement agreement between the Massies and the United States was a contract and that its adjudication was within the court's jurisdiction. The court allowed the parties to submit additional briefing on whether any obligations survived the settlement agreement payments made by the United States to set up the trust or the Massies' decision to elect to participate in the rehabilitation plan. The court indicated that following such submissions it would review the case as one on summary judgment.

Following briefing on the plaintiff's allegations of breach of contract, the court heard additional oral argument from the parties. At the start of the session, both parties expressed their agreement with the court's fact-finding included in the September 30, 1996 order denying defendant's motion to dismiss.[1] The parties also stated that the only issue remaining in dispute is whether the United States had any additional obligation to guarantee the payments once the annuity was funded and the medical care trust was established in accordance with the terms of the settlement agreement.

### FACTS

Autumn Massie was born on June 8, 1983, at the United States Naval Hospital in Naples, Italy, to James L. Massie and Jill K. Massie, her natural parents.[2] In 1983, plaintiff, Jill K. Massie, as mother and next of friend of Autumn Massie, a minor, filed a claim with the United States Department of the Navy pursuant to the Military Claims Act, 10 U.S.C. § 2733. In their Military

Claims Act claim, the Massies alleged that Autumn Massie suffered personal injuries during birth at the United States Naval Hospital, Naples, Italy, and attributed the injuries to medical malpractice.

On February 15, 1986, the United States of America, acting through G. Lewis Michael, III, Captain, JAGC, United States Navy, Deputy Assistant Judge Advocate General (Claims), entered into an agreement for a structured settlement titled "SETTLE-MENT AGREEMENT," with James L. Massie and Jill K. Massie, individually and on behalf of their minor child, Autumn Massie. The purpose of the settlement agreement was to settle all claims the family had or might have with the Navy and its personnel regarding the causation of personal injuries to Autumn Massie at the time of her birth. The terms of the agreement included the following provision:

the Offerees hereby agree to accept this plan in full satisfaction and final settlement of any and all claims, liens, rights, or subrogated interests the Offerees now have or in the future may have against the United States, its officers, agents, or employees, for personal injury alleged to have resulted from medical malpractice during the birth of Autumn Massie at the United States Naval Hospital, Naples, Italy, on June 8, 1983.... Accordingly, the disposition of this claim as made herein is dispositive of all similar or related claims that have been or may be presented to any other government agency.

The settlement agreement provided that the United States would "pay to JMW Settlements, Inc., Washington, D.C., a sum not to exceed ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00), to be used and distributed on behalf of the United States ..." for: (a) the payment of a total sum of $150,000.00 to James and Jill Massie, (b) payment of $350,000.00 into a Reversionary Medical Care Trust on behalf of Autumn Massie, (c) the purchase of an annuity from an insurance

---

1. At a January 23, 1997 status conference, the parties also agreed that further discovery was not necessary.

2. Since the date of the original settlement agreement, James L. Massie and Jill K. Massie have divorced and Jill K. Massie was given custody of the minor, Autumn Massie.

company rated A+ by A.M. Best to be owned by the United States and which would "result in distributions on behalf of the United States," according to a schedule outlined in the agreement, and (d) payment to the Massie's attorney of record and to JMW Settlements. The settlement agreement between the Massies and the United States, in relevant part, states:

This agreement is made between the United States of America as Offeror (hereinafter "the United States"), and James L. Massie and Jill K. Massie, individually and as Natural Parents and Legal Guardians of Autumn Massie, a minor (hereinafter, "the Offerees").

The United States hereby agrees to utilize a sum not to exceed ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00) according to the plan set forth in the document, and the Offerees hereby agree to accept this plan in full satisfaction and final settlement of any and all claims, liens, rights, or subrogated interests the Offerees now have or in the future may have against the United States, its officers, agents, or employees, for personal injury alleged to have resulted from medical malpractice during the birth of Autumn Massie at the United States Naval Hospital, Naples, Italy, on June 8, 1983. For the purposes of the settlement agreement, it is understood that, pursuant to Department of Defense Directive 5515.8 of November 14, 1974, the Department of Navy has been designated as the single agency to decide the merits and to negotiate the disposition of this claim. Accordingly, the disposition of this claim as made herein is dispostive of all similar or related claims that have been or may be presented to any other government agency.

1. As soon as it is practicable after the execution of this settlement agreement, the United States will pay to JMW Settlements, Inc., Washington, D.C., a sum not to exceed ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00), to be used and distributed on behalf of the United States as follows:

(a) The payment of the total sum of ONE HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($150,-000.00) to James L. Massie and Jill K. Massie in full satisfaction and final settlement of their individual claim.

(b) The payment of THREE HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($350,000.00) into a Reversionary Medical Care Trust, as more fully described in the Trust Agreement attached hereto and incorporated by reference herein, created on behalf of Autumn Massie.

(c) The purchase of an annuity from an insurance company rated A+ by A.M. Best to be owned solely and exclusively by the United States which will result in distributions on behalf of the United States as follows:

(i) Commencing one month from the date of purchase of the funding annuity, monthly payments in the amount of TWO THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($2,500.00) shall be paid to Autumn Massie or the guardian(s) of her life estate through the end of the twentieth (20th) year of the funding annuity. Commencing with the twenty-first (21st) year of the funding annuity, monthly payments in the amount of THREE THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($3,500.00) shall be paid to Autumn Massie or the guardian(s) of her life estate for the remainder of her life. The monthly payments provided for under this paragraph are guaranteed for fifteen (15) years. Upon the death of Autumn Massie, monthly payments under this paragraph shall cease; provided, however, that if Autumn should die prior to the end of the fifteenth (15th) anniversary of the funding annuity, then the aforesaid monthly payments shall be paid to her estate.

(ii) In addition to the aforesaid monthly payments, on the twenty-second (22nd) anniversary of the funding annuity, a lump-sum payment in the amount of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,-

000.00) shall be paid to Autumn Massie or the guardian(s) of her life estate; on the twenty-seventh (27th) anniversary of the funding annuity, a lump-sum payment in the amount of TWO HUNDRED THOUSAND DOLLARS AND NO CENTS ($200,000.00) shall be paid to Autumn Massie or the guardian(s) of her life estate; and on the thirty-second (32nd) anniversary of the funding annuity, a lump-sum payment in the amount of TWO HUNDRED THOUSAND DOLLARS AND NO CENTS ($200,000.00) shall be paid to Autumn Massie or the guardian(s) of her life estate. The deferred lump-sum payments provided for under this paragraph are guaranteed. If Autumn Massie should die prior to the payment of any of these lump-sum amounts, then the deferred lump-sum payments provided for under this paragraph shall be paid to her estate.

(iii) In addition to the aforesaid monthly payments and the deferred lump-sum payments to Autumn Massie or the guardian(s) of her life estate, on the tenth (10th) anniversary of the funding annuity, a lump-sum payment in the amount of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) shall be paid into the Reversionary Medical Care Trust created in paragraph 1.(b) above and the attached Trust Agreement; and on the twentieth (20th) anniversary of the funding annuity, an additional lump-sum payment of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) shall be paid into the aforesaid Reversionary Medical Care Trust.

The settlement agreement also states that "[a]ny portion of the ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00) remaining after the payments provided for in the above paragraphs shall be returned by JMW Settlements, Inc., to the United States."

On February 12, 1986, G. Lewis Michael, III, Captain, JAGC, United States Navy, entered into a trust agreement with the Maryland National Bank, as trustee, which was incorporated into the settlement agreement, and titled "AUTUMN MASSIE IRREVOCABLE REVERSIONARY MEDICAL CARE TRUST AGREEMENT." The annuity and structured payment products were purchased for the benefit of Autumn Massie from Executive Life Insurance Company (ELIC).

ELIC apparently experienced financial difficulties, and on April 11, 1991, the California Department of Insurance obtained a court order to place ELIC, a wholly-owned subsidiary of First Executive Corporation (First Executive), in conservation. First Executive subsequently filed for reorganization under Chapter 11 of the United States Bankruptcy Code. On May 2, 1991, the California Insurance Commissioner sent a report to all ELIC contract holders discussing his decision to place ELIC in conservatorship and describing the procedures and policies that would be in effect during the conservatorship. In August 1991, the Commissioner reached preliminary agreements with one company to purchase most of ELIC's high-yield or "junk" bond portfolio, and with two groups to purchase most of ELIC's remaining assets and to assume its restructured liabilities to contract holders. In a September 6, 1991 mailing to contract holders, the Commissioner explained that other bidders would have an opportunity to offer better terms than those already negotiated with the two groups. After several rounds of bidding, the two initial groups increased their bids by several hundred million dollars, and, on November 14, 1991, the Commissioner recommended that the Conservation Court approve the increased bid by the two groups.

On January 29, 1992, contract holders were sent notice of the Hearing on Approval and Adoption of Plan of Rehabilitation. The hearing began on February 25, 1992. On March 3, 1992, with the approval of the Conservation Court, ELIC sold the majority of its high-yield bonds to one of the two groups. On July 31, 1992, the Conservation Court approved the initial rehabilitation plan, although certain parties appealed the Conservation Court's decision. On March 23, 1993,

the Appellate Court ruled that the initial rehabilitation plan should be modified.

In his May 10, 1993 report to contract holders, the Commissioner announced the outlines of a modified rehabilitation plan which was submitted to the Conservation Court for approval. In addition to correcting the deficiencies identified by the Appellate Court, the modified plan provided enhanced benefits to contract holders. After another lengthy hearing, the Conservation Court approved the modified plan on August 13, 1993. On August 20, 1993, certain parties filed a challenge to the modified plan in the appellate court. That challenge was dismissed on August 31, 1993, although the same parties, and others, subsequently filed further appeals.

On August 13, 1993, the California Superior Court issued a Final Order Approving Modified Plan of Rehabilitation (Final Order). In the Final Order, the court determined that "all interested parties and contract holders have had full, fair and adequate notice of the hearings on the Modified Plan held between June 9, 1993, and July 12, 1993 ("Hearings") and that all interested parties have had full, fair, and adequate opportunity to present evidence at the Hearings. . . ." In addition, the court specifically held:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. The Modified Plan is approved in all respects.

2. All objections to the Modified Plan which were made or which could have been made are hereby in all things overruled.

\* \* \* \* \* \*

10. All of the respective obligations of the parties to and rights under the Modified Plan are valid, binding and enforceable.

\* \* \* \* \* \*

13. This Court reserves jurisdiction necessary to enforce this Final Order and the Order referenced and incorporated herein. This Court hereby continues to assert and exercise exclusive jurisdiction over the Modified Plan, over ELIC and over any claim, counterclaim or other action involving a third party relating to any of the Transferred Assets. All prior orders of this Court including, but not limited to, all injunctions and restraining orders, are hereby affirmed and continued in full force and effect except to the extent inconsistent with this Final Order.

On December 29, 1993, policy holders, annuitants, and contract holders were sent notice of approval of the modified rehabilitation plan and offered an opportunity to participate in the plan. The notice outlined the procedures for participation by offering two options, either to elect to participate in the plan or to opt out of the rehabilitation plan. The notice also stated that: "[i]f you do not respond by February 12, 1994 as instructed by this mailing, you will be deemed to have elected to participate in the Plan." The mailing also included an information booklet, a guide to election package forms, an individualized set of forms including a personalized Contract Values Summary, a Product Summary, Election Forms, and an invitation to make further inquiry, if necessary. In a status report submitted to the court by the plaintiff on April 10, 1996, the plaintiff submitted a copy of an Election Form to participate in the Rehabilitation Plan, signed by James A. Harris, III, attorney for Jill and Autumn Massie, dated February 7, 1994. The form stated:

**IMPORTANT: Only use this form if you intend to participate in the Plan.**

To make your election to participate, please complete this form and return it in the enclosed envelope.

Please read all of the accompanying information carefully before completing any Election Form.

If Executive Life Insurance Company ("ELIC") has not received a properly completed Election Form by 2/12/94, you will irrevocably be deemed to have elected to participate according to all terms of the Rehabilitation Plan as approved by the Court.

**ELECTION**

I elect to participate in the Rehabilitation Plan and accept the Restructured Contract and the assumption of such contract by Aurora National Life Assurance Company. I recognize that by participating in the Rehabilitation Plan, except as expressly preserved under the Enhancement Agreement, *I am releasing all Participating*

*Guaranty Associations* from all payments and claims other than those provided under the Enhancement Agreement. If the Participating Guaranty Association box indicates "NONE," I retain all rights to assert that I am a contract owner covered under any applicable Guaranty Association statute.

**By participating in the Rehabilitation Plan, I accept the terms of the Rehabilitation Plan as approved by the Court. I realize that once I elect to participate and this form is received by ELIC, my decision is irrevocable.**

(emphasis added).

Subsequent to the issuance of the Final Order, the annuity products and structured payment products which had been purchased for the benefit of Autumn Massie from ELIC were restructured pursuant to the court-approved rehabilitation plan. Plaintiff contends that the settlement agreement obligated the United States to pay particular sums of money on prescribed terms, but that those sums have not been and will not be paid, due to the restructuring which resulted from the rehabilitation plan. The plaintiff has represented that the payments under the annuity have been and will be decreased as represented below:

| Payments to Autumn Massie | Settlement Agreement | Restructured |
| --- | --- | --- |
| Monthly Annuity (1993—2006) | $ 2,500.00 | $ 1,316.00 |
| Monthly Annuity (2006 until death) | 3,500.00 | 1,820.00 |
| Lump sum payment 2008 | 100,000.00 | 52,000.00 |
| Lump sum payment 2013 | 200,000.00 | 104,000.00 |
| Lump sum payment 2018 | 200,000.00 | 104,000.00 |
| Payments to Medical Care Trust | | |
| Lump sum payment 1996 | 100,000.00 | 59,000.00 |
| Lump sum payment 2006 | 100,000.00 | 59,000.00 |

Plaintiff claims that as a result of the decrease in the payment amounts set out above, the defendant has breached its contract with the plaintiff, thereby causing her to be underpaid to date, and that she will continue to be underpaid in the future. Therefore, plaintiff contends that defendant, United States, is in breach of the settlement agreement due to the decrease in payments. Plaintiff specifically requests the following relief in the complaint filed in this court:

WHEREFORE, Plaintiff prays that a judgment be entered against the defendant in favor of Plaintiff in such amount as this Court may assess together with interest thereon as provided by law, and costs and disbursements of this proceeding, as well as such or other relief as this Court deems just and necessary.

### DISCUSSION

#### Motion To Dismiss

■ When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.* at 747.

■ The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), has been articulated by the United States Supreme Court and the United States Court of Ap-

peals for the Federal Circuit as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed* 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

■ The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Moreover, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

■ In order for this court to have jurisdiction over plaintiffs complaint, the Tucker Act, 28 U.S.C.A. § 1491 (1997), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C.A. § 1491. The Tucker Act provides:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C.A. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the Court of Federal Claims; it does not create a substantive right enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I* ); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc* ), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

■ Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. at 953. Stated otherwise, "in order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (*Mitchell II* ) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. at 954 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

This court's predecessor, the United States Court of Claims, articulated the jurisdiction of this court pursuant to 28 U.S.C.A. § 1491 in *Eastport Steamship Corp. v. United States,* as follows:

Section 1491 of Title 28 of the United States Code allows the Court of Claims to

entertain claims against the United States "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort". But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money.

*Id.* at 605, 372 F.2d 1002 (citations omitted).

■ In its motion to dismiss and in its reply the defendant argues that: (1) the Military Claims Act is a comprehensive, complete, and exclusive act regarding review of military claims; (2) judicial review of the Secretary's decision is limited; and (3) the settlement agreement entered into with the Massie family pursuant to the Military Claims Act is not a "contract" of the kind which confers Tucker Act jurisdiction in the Court of Federal Claims. In response, the plaintiff argues that: (1) the settlement agreement entered into with the Massies is an express contract in keeping with other contracts enforced by this court; and (2) the plaintiffs claim is not based on a request for review of the substantive issues heard pursuant to the Military Claims Act, but is a request for enforcement of the settlement contract entered following disposition and allowance of the claim, and as an express contract, jurisdiction is based not on the Military Claims Act, but is founded on the Tucker Act, 28 U.S.C.A. § 1491.

The Military Claims Act, codified in chapter 163 of title 10 of the United States Code, sets out the statutory scheme for resolution of a plaintiffs claims against the military for loss of property, personal injury or death. Plaintiff in the instant case brought its original claim pursuant to 10 U.S.C. § 2733 (1982). The relevant portions of section 2733 applicable to enforcement of the settlement agreement state:

**§ 2733. Property loss; personal injury or death: incident to noncombat activities of Department of Army, Navy, or Air Force**

(a) Under such regulations as the Secretary concerned may prescribe, he, or, subject to appeal to him, the Judge Advocate General of an armed force under his jurisdiction, or the chief [sic] Counsel of the Coast Guard, as appropriate, if designated by him, may settle, and pay in an amount not more than $100,000, a claim against the United States for—

\* \* \* \* \* \*

(3) personal injury or death;

either caused by a civilian officer or employee of that department, or the Coast Guard, or a member of the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be, acting within the scope of his employment, or otherwise incident to noncombat activities of that department, or the Coast Guard.

10 U.S.C. § 2733(a).[3] The Military Claims Act also includes language in 10 U.S.C. § 2735, which states that:

Notwithstanding any other provision of law, the settlement of a claim under section 2733, 2734, 2734a, 2734b, or 2737 of this title is final and conclusive.

10 U.S.C. § 2735. Section 2731 of the Military Claims Act defines the term "settle," as follows: " 'settle' means consider, ascertain, adjust, determine, and dispose of a claim, whether by full or partial allowance or by disallowance." 10 U.S.C. § 2731. The procedural regulations for presenting a claim are contained in 32 C.F.R. § 750.50 *et seq.* (1986).

There is no dispute regarding the facts of the case at bar. There is also no dispute that the Massie family pursued its claim in the correct fashion and settled the case in accordance with the applicable statute and regulations. Furthermore, the plaintiff does not challenge the rectitude of the terms of the settlement agreement entered into by James and Jill Massie, individually and as natural parents and legal guardians of the minor, Autumn Massie, and signed by G. Lewis Michael III, Captain, JAGC, Deputy Assistant Judge Advocate General (Claims),

---

**3.** The Act of October 30, 1984, § 1(1), Pub.L. 98–564, 98 Stat. 2918, substituted "Chief Counsel" for "chief legal officer" and "$100,000" for "$25,000."

on behalf of the United States. In fact, the plaintiff concedes with regard to the resolution of her claims under the Military Claims Act that judicial review of the decision made by the Secretary of the Navy is limited. *See also Collins v. United States,* 32 Fed.Cl. 256, 258 (1994), *aff'd,* 67 F.3d 284 (Fed.Cir.1995) (denying judicial review of the military's disallowance of a claim under the Military Claims Act absent a constitutional claim).

Rather, the plaintiff in the above-captioned case is contesting the alleged failure of the United States to abide by the terms of the settlement agreement entered into by the parties following allowance of plaintiffs claims. At issue, therefore, is whether the language in 10 U.S.C. § 2735, which states that disposition of a claim is "final and conclusive," refers only to resolution of the validity of the claim and the amount of the award, or also prohibits actions brought to enforce a settlement agreement entered into by the parties following a determination under the Military Claims Act.

With respect to enforcement of a settlement agreement and whether a breach has been alleged, the relevant sections of the Military Claims Act and its implementing regulations are silent. The defendant argues that the Military Claims Act is a comprehensive, complete, and exclusive act, and that the "final and conclusive" language in 10 U.S.C. § 2735 bars review not only of the Secretary's disposition of a claim brought pursuant to the Military Claims Act, but also forbids any judicial review of issues related to such a claim, absent a constitutional challenge. Defendant suggests that the only methods available to review a claim and/or settlement agreement entered into pursuant to a Military Claims Act claim are reconsideration by the Secretary in limited circumstances, appeal to the GAO, or a private bill in Congress. Regarding the availability of judicial review, the defendant identifies no distinction between a claim brought to contest the correctness of the Secretary's decision to grant or deny a claim under the Military Claims Act and a claim brought by a plaintiff, such as Mrs. Massie, to enforce a settlement agreement between the United States and

the plaintiff following resolution of the underlying Military Claims Act claim.

It is well established "[t]hat the United States, when it creates rights in individuals against itself, is under no obligation to provide a remedy through the courts," and that, "where a statute creates a right and provides a special remedy that remedy is exclusive." *United States v. Babcock,* 250 U.S. 328, 331, 39 S.Ct. 464, 465, 63 L.Ed. 1011 (1919) (citations omitted). In the instant case, the plaintiff, however, is not requesting review of the decision by the Secretary of the Navy to settle the case or requesting review of the amount determined by the Secretary to be a fair award for the injury suffered. All of the parties to this action accept the terms of the settlement between the United States and the Massies.

Following disposition of Autumn Massie's claim in accordance with 10 U.S.C. §§ 2731 and 2733, however, rather than authorizing immediate payment to the plaintiff and her family, the United States entered into a separate settlement agreement, signed by the plaintiff and the defendant, to establish a structured payout plan. The opening paragraphs of the agreement, titled SETTLEMENT AGREEMENT, state as follows:

This agreement is made between the United States of America as Offeror (hereinafter "the United States"), and James L. Massie and Jill K. Massie, individually and as Natural Parents and Legal Guardians of Autumn Massie, a minor (hereinafter, the "Offerees").

The United States hereby agrees to utilize a sum not to exceed ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00) according to the plan set forth in this document, and the Offerees hereby agree to accept this plan in full satisfaction and final settlement of any and all claims, liens, rights, or subrogated interests the Offerees now have or in the future may have against the United States, its officers, agents, or employees, for personal injury alleged to have resulted from medical malpractice during the birth of Autumn Massie at the United States Naval Hospital, Naples, Italy, on June 8, 1983. For the

purposes of this settlement agreement, it is understood that, pursuant to Department of Defense Directive 5515.8 of November 14, 1974, the Department of the Navy has been designated as the single agency to decide the merits and to negotiate the disposition of this claim. Accordingly, the disposition of this claim as made herein is dispositive of all similar or related claims that have been or may be presented to any other government agency.

The agreement then describes the method for funding the structured settlement, the payout provisions, and details the specific amounts of future payments and the ages at which Autumn Massie would be entitled to payouts. This document was signed on February 12, 1986, on behalf of the United States by G. Lewis Michael, Captain, JAGC, United States Navy, Deputy Assistant Judge Advocate General (Claims) and, on February 15, 1986, by Mr. and Mrs. Massie, individually and as parents and legal guardians of Autumn Massie. The document was also signed on February 28, 1986 by Jon W. Brassel, Esq., and by Robert H. Heller, Jr., Judge, Circuit Court for Anne Arundel County, although Heller's signature, which appears above the line designated for the "signature of the Approving Judge" and the stamp bearing his name and title, is difficult to read. The signature of the approving Anne Arundel Circuit County Judge, a nonfederal official, on the settlement agreement document suggests that the settlement agreement represents a definitive and separate agreement undertaken beyond the steps contemplated by the Military Claims Act.

In addition, also on February 12, 1986, the date on which Captain Michael signed the settlement agreement on behalf of the United States, he also signed the "IRREVOCABLE REVERSIONARY MEDIAL CARE TRUST AGREEMENT" as "settlor" "for the use and benefit of Autumn Massie." The trust agreement, which was incorporated into the settlement agreement, was also signed by Jesse Sternberger III, a Vice President of the Maryland National Bank, as trustee, on March 31, 1986. Both signatures were attested to and notarized. The trust agreement states that:

Pursuant to the terms of the Settlement Agreement, the United States of America, through the Department of the Navy, has agreed to create a Medical Trust for the use and benefit of Autumn Massie, a minor, subject to certain limitations and conditions; namely, that the Trust is intended to provide reasonable and necessary medical, institutional and related care and services to the Beneficiary, Autumn Massie, during her lifetime, and that upon the death of Autumn Massie, the Trust Estate (including all accrued or unexpended income) shall revert to the Settlor, the United States of America.

The initial trust estate contribution by the United States was to be $350,000.00. The trust agreement also indicated that an annuity was to be purchased in order to:

pay the sum of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) to the Trust Estate on the TENTH (10th) anniversary of the funding annuity and an additional sum of ONE HUNDRED THOUSAND DOLLARS AND NO CENTS ($100,000.00) on the TWENTIETH (20th) anniversary of the funding annuity. The deferred lump-sum payments are guaranteed.

The provisions of the Military Claims Act applicable to the instant case, 10 U.S.C. §§ 2731 and 2733(a), give authority to the Secretary of the relevant military service branch, or his designee, to "consider, ascertain, adjust, determine and dispose of a claim, whether by full or partial allowance or by disallowance." Further, 10 U.S.C. § 2735 decrees that the settlement by the Secretary or his designee is "final and conclusive." The words included in each of these provisions are plain and unequivocal on their face and require no resort to the legislative history for explanation. *Reid v. Department of Commerce,* 793 F.2d 277, 281 (Fed.Cir.1986) (citing *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575, *reh'g denied,* 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70 (1961)). Moreover, the plaintiff does not disagree with the defendant that review of the merits of the underlying claim for the injury to Autumn Massie has been finally adjudicated by the Secretary.

Defendant, nonetheless, looks to the legislative history of the statute to resolve whether issues regarding enforcement of the settlement agreement entered into by the parties following determination of the merits of the claim are reviewable in this or any other court. Citing to the legislative history, defendant argues:

It should be without question that the MCA [Military Claims Act], or a private bill of Congress, were Ms. Massie's only alternatives to seeking redress for her injuries. The MCA was originally enacted in 1943 in order to provide an administrative procedure by which claimants against the armed services could seek compensation. Prior to enactment of the MCA, the only redress available for personal injury claims against the military was a private bill by Congress. *See Claims for Damage, Loss, Injury or Death Caused by Military Personnel or Civilian Employees: Hearing on S. 1026 Before Senate Comm. on Military Affairs*, 78th Cong., 1st Sess. 4–5 (May 4, 1943).

The defendant also points to further language in the legislative history that states:

in addition to the right of a claimant to appeal from a delegatee's settlement, every approving authority has the inherent right to reconsider its own settlement action at any time in order to correct an injustice in accordance with Comptroller General and court decisions. Otherwise, such settlements are final and conclusive.

S.Rep. No. 1524, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 3627, 3629 (adopting House report). Defendant concludes that the legislative history of the Mili-

tary Claims Act precludes judicial review in the courts, and that if a claimant is not satisfied, he or she may still seek a private redress bill from Congress, which right Congress has preserved. *See* 89 Cong. Rec. 6093, 6749 (1943); *Hearings on S. 1026 Before Comm. on Military Affairs*, 78th Cong., 1st Sess 7–8 (May 4, 1943). Although the legislative history indicates that Congress wished to retain the right of a citizen to apply for a private bill to adjudicate the merits of a claim against a military service branch, neither logic nor any words in the statute or legislative history suggest that Congress intended for enforcement actions on settlement agreements to be brought to Congress by individual applications for private bills.[4]

This court, however, remains unpersuaded that either the language of the applicable statute or the legislative history resolves the dispute currently before this court. Furthermore, the precedent which interprets the Military Claims Act also does not resolve this case. A comprehensive recitation of previous Military Claims Act decisions is contained in *Collins v. United States*, 32 Fed.Cl. 256 (1994), *aff'd*, 67 F.3d 284 (Fed.Cir.1995), as follows:

As previously noted the Military Claims Act makes the decisions of the various Secretaries "final and conclusive" "notwithstanding any other provision of law." 10 U.S.C. § 2735. While this court has not had occasion to address the finality provision of the Military Claims Act, "[e]very circuit that has addressed the language of section 2735 has concluded that it precludes judicial review of the military's dis-

---

**4.** The legislative history contains a brief debate which suggests that the Military Claims Act provisions were intended to resolve only the level of monetary entitlement.

Colonel CLARK.... [i]f the individual accepts this award he gives a release, which every disbursing officer is required to take when he pays out appropriated funds of the Government, he gives an unconditional release on his claim and his claim is satisfied. That is the purpose of the language of that provision.

Senator AUSTIN. Now, then, from what I have overheard, it was the effect that he could after that go to Congress and present a claim to the Congress for the same subject matter. Do you believe that?

Colonel CLARK. I do not believe the Congress, under those conditions, would grant relief to the individual. It is not, as I would interpret it, a statutory prohibition to his forever after making a claim.

Senator AUSTIN. I think men might differ about that, because it says it shall be final and conclusive for all purposes. That affects him as much as it does anybody, in my judgment.

Colonel CLARK. It is intended primarily to be a fiscal determination, so the accounts of the disbursing officer paying it will not be affected. *Hearings on S. 1026 Before Senate Comm. on Military Affairs*, 78th Cong., 1st Sess. 9 (May 4, 1943).

allowance of a claim under the Act, absent a constitutional claim." *Schneider v. United States,* 27 F.3d 1327, 1332 (8th Cir. 1994); *see also Hata v. United States,* 23 F.3d 230, 232–33 (9th Cir.1994); *Rodrigue v. United States,* 968 F.2d 1430, 1432–34 (1st Cir.1992); *Poindexter v. United States,* 777 F.2d 231, 233–37 (5th Cir.1985); *Broadnax v. United States Army,* 710 F.2d 865, 867 (D.C.Cir.1983); *LaBash v. United States Dept. of the Army,* 668 F.2d 1153, 1155–56 (10th Cir.1982); *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2299, 73 L.Ed.2d 1303 (1982); *Towry v. United States,* 459 F.Supp. 101, 107 (E.D.La.1978), *aff'd,* 620 F.2d 568 (5th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981); *Bryson v. United States,* 463 F.Supp. 908, 910 (E.D.Pa.1978). *But see Welch v. United States,* 446 F.Supp. 75, 77–78 (D.Conn.1978) (suggesting broad judicial review).

In *Shull v. United States,* 228 Ct.Cl. 750, 1981 WL 21476 (1981), the Court of Claims ruled that the Army's denial of Shull's claim, brought under the Military Personnel and Civilian Employees' Claims Act of 1964 ("MPCECA"), was beyond judicial review. The MPCECA, just like the Military Claims Act, states that "[n]otwithstanding any other provision of law, the settlement of a claim ... is final and conclusive." *Id.* at 754–55. The court, relying upon *United States v. Babcock,* 250 U.S. 328, 39 S.Ct. 464, 63 L.Ed. 1011 (1919), determined that this finality provision of the MPCECA precluded further judicial review. *Shull* at 755–57, 228 Ct. Cl. 750. The court went on to note that "other federal courts have reached the same conclusion as to the related and identical finality language of 10 U.S.C. § 2735 (1976), which is applicable to military claims brought under 10 U.S.C. §§ 2731– 2737." *Id.* at 757; *see also Merrifield v. United States,* 14 Cl.Ct. 180, 184 (1988) (relying upon prior judicial interpretations of the Military Claims Act's finality language in ruling that the identical finality language contained in the MPCECA precluded judicial review).

*Collins v. United States,* 32 Fed.Cl. at 258– 59.

Although the parties in the instant dispute acknowledge the validity of the allowance by the Secretary of plaintiffs claim pursuant to the Military Claims Act, this case concerns a claim for enforcement of the settlement contract which followed the decision on the merits of the injury claim. The nature and terms of the settlement agreement entered into between the parties, together with the reversionary trust agreement, convince the court that following administrative disposition of the Military Claims Act claim, which was resolved in accordance with the applicable statutory and regulatory procedures, the United States entered into an unconditional, express contract to provide future payments to the Massies, for the benefit of Autumn Massie. The only reference to the Military Claims Act in the settlement agreement relates to the authority of the Navy to sign the settlement agreement, and that by signing the agreement, the Massies gave up their claim and any similar or related claims, as follows:

> For the purposes of this settlement agreement, it is understood that, pursuant to Department of Defense Directive 5515.8 of November 14, 1974, the Department of the Navy has been designated as the single agency to decide the merits and to negotiate the disposition of this claim. Accordingly, the disposition of this claim as made herein is dispositive of all similar or related claims that have been or may be presented to any other government agency.

The settlement agreement reads as a contractual document between two independent parties, the United States and the Massies. The agreement obligates the United States to utilize a sum not to exceed $1,300,000.00 to fund the payment plan outlined in the document and obligates the Massies to forego any future claims, liens, rights or subrogated interests, now or in the future, against the United States, its officers, agents, or employees. The structured payment schedule detailed in the agreement goes far beyond the decision of the Secretary of the Navy to allow the Massies' claim and assumes an independent status that is dependent on future acts by the government to create a reversionary medical trust on behalf of the

injured Autumn Massie and establishes dates for payment obligations.

Moreover, the settlement agreement entered into by the United States and the Massies fits the classic definition of an express contract. The parties both intended to be bound and clearly expressed their intention in a manner capable of understanding. There was a definite offer and an unconditional acceptance. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 608, 537 F.2d 474 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). In addition, the plaintiff has shown that the government official whose conduct is relied upon had actual authority to bind the government to the contract. *See H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). No dispute has been raised in the above-captioned case regarding the authority of Captain Michael to sign on behalf of the United States.

 Not only is a compromise settlement agreement a contract, but contract interpretation principles may be used to determine the validity of a settlement agreement. *Core–Vent Corp. v. Implant Innovations, Inc.,* 53 F.3d 1252, 1258 (Fed.Cir.1995); *Link v. Department of Treasury,* 51 F.3d 1577, 1582 (Fed.Cir.1995) (citing *Greco v. Department of the Army,* 852 F.2d 558, 560 (Fed. Cir.1988)); *Mays v. United States Postal Service,* 995 F.2d 1056, 1059 (Fed.Cir.1993); *Bloomington Hosp. v. United States,* 29 Fed. Cl. 286, 292 (1993); *Hughes Aircraft Co. v. United States,* 15 Cl.Ct. 550, 553 (1988).

The basic jurisdictional principles applicable to this case have been articulated by the Court of Appeals for the Federal Circuit as follows:

It is axiomatic that the Tucker Act "is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). A claimant must therefore demonstrate either that he or she has an "express or implied contract with the United States," 28 U.S.C. § 1491, or that some applicable source of substantive law " 'can

fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " *Testan,* 424 U.S. at 400, 96 S.Ct. at 955 (quoting *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967)).

*Brown v. United States,* 86 F.3d 1554, 1559 (Fed.Cir.1996).

Subsequent to the decision in *Testan,* the Supreme Court in *United States v. Mitchell,* 463 U.S. 206, 215–16, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (*Mitchell II*), stated the following:

The existence of a waiver is readily apparent in claims founded upon "any express or implied contract with the United States." 28 U.S.C. § 1491. The Court of Claims' jurisdiction over contract claims against the Government has long been recognized, and Government liability in contract is viewed as perhaps "the widest and most unequivocal waiver of federal immunity from suit." Developments in the Law—Remedies Against the United States and Its Officials, 70 Harv. L.Rev. 827, 876 (1957). See also 14 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3656, p. 202 (1976). The source of consent for such suits unmistakably lies in the Tucker Act. Otherwise, it is doubtful that *any* consent would exist, for no contracting officer or other official is empowered to consent to suit against the United States. The same is true for claims founded upon executive regulations. Indeed, the Act makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law.

*United States v. Mitchell,* 463 U.S. at 215–16, 103 S.Ct. at 2967 (footnote omitted).

 Ordinarily, there is a strong presumption favoring judicial review so as not to leave individuals without a judicial remedy. *Block v. Community Nutrition Institute,* 467 U.S. 340, 348–49, 104 S.Ct. 2450, 2455–56, 81 L.Ed.2d 270 (1984). The court recognizes, however, that just because this plaintiff might have no judicial recourse and that her recourse if the agency will give her no relief might be in the GAO, or to seek a private bill

in Congress, is not enough for this court to assume jurisdiction. Although harsh, numerous courts have stated: "[t]he court acknowledges that dismissal of plaintiffs complaint will most likely leave them without a forum to present their claim. This fact, however, cannot influence the court's determination."[5] *Bloomington Hospital v. United States,* 29 Fed.Cl. 286, 293 (1993). Moreover, it is also true that:

> even if a claim asserted in a complaint is assumed to be one founded upon a contract or a legal provision, which can be construed fairly as mandating the payment of monies sought and thus nominally within the jurisdiction of this Court pursuant to the Tucker Act, it is well established that this court will lack jurisdiction to entertain that claim if Congress has expressly placed jurisdiction over that claim elsewhere.

*Puget Sound Power & Light Co. v. United States,* 23 Cl.Ct. 46, 58–59 (1991), *appeal dismissed,* 944 F.2d 912 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1160, 117 L.Ed.2d 408 (1992).

■■■ The contract at issue is not a procurement or disposal of property contract, such as those contemplated by the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 602 (1988). The CDA is not applicable to contracts in which the government obligates itself to provide services to a contractor. However, contracts such as the express contract at issue in this case, which are not covered by the CDA have been recognized as appropriate for review in this court. *See Pasteur v. United States,* 814 F.2d 624, 628 (Fed.Cir.1987). In a contract case, it is the law of contracts which mandates the obligation of the United States to pay compensation for breach of contract. *Peter v. United States,* 6 Cl.Ct. 768, 777 (1984).

> Where a contract, express or implied, has been made by federal officials who Congress has authorized to so act on behalf of the United States, however, the court is not required to make further inquiry to determine whether a separate source of substantive law mandates compensation.

Where such a valid contract has been made, a claim founded upon its breach is cognizable under the provisions of 28 U.S.C. § 1491(a)(1).

*Id.* at 777; *see Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607 n. 7, 372 F.2d 1002, 1008 n. 7 (1967); *San Carlos Irrigation and Drainage Dist. v. United States,* 15 Cl.Ct. 197, 201 (1988), *rev'd on other grounds,* 877 F.2d 957 (Fed.Cir.1989) (citing *Juda v. United States,* 6 Cl.Ct. 441, 453 (1984)).

■■■ In support of its motion to dismiss, defendant tried to rely on a number of distinguishable cases to argue that this court is without jurisdiction in the instant case. For example, defendant cited to cases originally brought under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, namely, *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), *Lee v. United States,* 33 Fed.Cl. 374 (1995), and *Fausto v. United States,* 16 Cl.Ct. 750 (1989). In each of these cases, the settlement agreement resulted from an underlying Title VII discrimination claim. Title VII does not vest jurisdiction in the United States Court of Federal Claims for actions which seek redress under the Civil Rights Act of 1964. *Brown v. General Services Administration,* 425 U.S. at 835, 96 S.Ct. at 1969; *Lee v. United States,* 33 Fed.Cl. at 379; *Fausto v. United States,* 16 Cl.Ct. at 753. Moreover, in *Brown,* the court was asked to review the underlying employment decision. In *Good,* the court, using reasoning similar to that applied in *Lee,* indicated why the case brought as a breach of contract case could not succeed.

> Where the position held by a federal employee is pursuant to an appointment specified by law, the rights and protections accorded that position are governed exclusively by statute. *Riplinger v. United States,* 695 F.2d 1163 (9th Cir.1983). The employing agency has no authority to supplement those rights and protections by a promise to respond in damages should it

---

5. It should be noted that in many of the cases, including *Bloomington Hospital,* the absence of an available remedy was the result of the failure of a plaintiff to previously exercise all available administrative options.

fail to accord the employee the emoluments of his office. *Shaw v. United States,* 226 Ct.Cl. 240, 251, 640 F.2d 1254, 1260 (1981).

Moreover, even if we assume the existence of such authority in the agency, the settlement agreement would still fail as a contract. That agreement does not contemplate an enlargement of plaintiffs rights; it is, rather, only an acknowledgement of his existing entitlements. Thus, the agreement is enforceable not because of a promise made by the Government but because of the Government's pre-existing legal duties to plaintiff. In short, the element of "exchange" on which the notion of a contract depends, is not present here. Restatement (Second) of Contracts § 73 (1981) ("[p]erformance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration. . . .").

*Good v. United States,* 23 Cl.Ct. 744, 746 (1991).

In *Bobula v. United States Department of Justice,* 970 F.2d 854 (Fed.Cir.1992), the court found no jurisdiction because the Civil Service Reform Act (CSRA) and the Supreme Court decision in *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830, *reh'g denied,* 485 U.S. 972, 108 S.Ct. 1250, 99 L.Ed.2d 448 (1988), provide petitioners with only one avenue for review of personnel actions such as those raised, and specifically deny review in this court under the Tucker Act, 28 U.S.C.A. § 1491. *Amin v. Merit Systems Protection Board* and *Lavender v. Merit Systems Protection Board,* 951 F.2d 1247 (Fed.Cir.1991), two consolidated cases, also dealt with underlying personnel actions. The plaintiff in *Amin* contested the validity of, and sought to set aside, a settlement agreement based on the alleged lack of authority on the part of his attorney to enter into the agreement. In *Lavender,* the plaintiff had not complied with the terms of the settlement agreement, but argued that his employer also had not complied. Moreover, the court found that the Merit Systems Protection Board had promulgated regulations governing the handling of settlement agreements by its administrative law judges

and plaintiffs could not resolve their disputes otherwise.

In *Puget Sound Power & Light Co. v. United States,* 23 Cl.Ct. 46 (1991), the court found that this court had no jurisdiction because the Northwest Power Act, 16 U.S.C. § 839f(3)(5), under which the claim arose, specifically vested judicial review of such claims in another Federal court. In *Matson Navigation Co. v. United States,* 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932), the court similarly found that the United States Court of Claims had no jurisdiction because the suit was founded on the Suits in Admiralty Act, over which the district courts had exclusive judicial review authority.

In *In re John Muir Memorial Hospital,* 221 Ct.Cl. 843, 1979 WL 10395 (1979), the court found that it lacked jurisdiction because the plaintiff had failed to exhaust established administrative remedies in a timely fashion. And, in *Bloomington Hospital v. United States,* 29 Fed.Cl. 286 (1993), the court declined jurisdiction and found that the plaintiffs were not proper parties to the settlement agreement. The Bloomington Hospital court, however, acknowledged that "notwithstanding this court's ability to exercise jurisdiction when a settlement agreement or contract with the federal government is at issue, it is clear that plaintiffs are merely seeking a redetermination of a continuing Medicare reimbursement dispute." *Id.* at 293.

In the instant case, the authorized actions of the officer designated by the United States to enter into the settlement and trust agreements constituted the separate exercise of a binding contractual authority, subsequent to the exercise of the Secretary's decision to allow plaintiffs Military Claims Act claim. Because the plaintiff does not have available alternative avenues of administrative and judicial review, and because the Military Claims Act does not address enforcement of settlement agreements, this court exercised its jurisdiction to review the breach of contract alleged by the plaintiff. The government should not be allowed to evade review of an alleged failure to fulfill its contractual agreements.

### Summary Judgment

The agreement between the parties and the court that there are no genuine issues of material facts in dispute renders the above-captioned case ripe for summary disposition. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); RCFC 56(c). The sole issue before the court is one of contract interpretation which is a matter of law resolvable by summary judgment. *Joe LeMoine Constr., Inc. v. United States*, 36 Fed.Cl. 4, 8 (1996) (citing *Muniz v. United States*, 972 F.2d 1304, 1309 (Fed.Cir.1992); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984)). It is well settled that issues of contract interpretation are questions of law to be decided by the court. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996) (citing *Fortec Constructors v. United States*, 760 F.2d at 1291); *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993); *Fortec Constructors v. United States*, 760 F.2d at 1291; *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386, 351 F.2d 972, 974 (1965).

When interpreting the language of a contract, a court must give a reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors*, 760 F.2d at 1292 (citing *United States v. Johnson Controls, Inc.* 713 F.2d 1541, 1555 (Fed.Cir.1983)); *see also McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.1996). To ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979) (citing *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975); *Northwest Marine Iron Works v. United States*, 203 Ct.Cl. 629, 637, 493 F.2d 652, 657 (1974)). Contract language should be given the plain meaning which would be derived by a reasonably intelligent person acquainted with the circumstances. *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. at 388, 351 F.2d at 975 (citations omitted); *see also A–Transport Northwest Co. Inc. v. United States*, 36 F.3d 1576, 1584 (Fed.Cir.1994); *Lockheed Support Sys., Inc. v. United States*, 36 Fed. Cl. 424, 428 (1996). The ordinary meaning of the language in contractual documents governs, and not a party's subjective but unexpressed intent. *International Transducer Corp. v. United States*, 30 Fed.Cl. 522, 526–27 (1994), *aff'd*, 48 F.3d 1235 (Fed.Cir.1995) (citations omitted). "Reasonableness is the standard." *Id.* at 527.

Courts will not read ambiguity into a contract provision if reading the contract as a whole or interpreting the contract language provides an unambiguous meaning. *See Huna Totem Corp. v. United States*, 35 Fed.Cl. 603, 611 (1996) (citing *International Transducer Corp. v. United States*, 30 Fed. Cl. at 530). "Courts are loathe to find ambiguity where the terms of the contract can be brought into harmony by a plain meaning interpretation rather than conflict by a strained interpretation." *Id.* (citing *Nicholson v. United States*, 29 Fed.Cl. 180, 192 (1993)); *see McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir.1996). In the event the court determines that the contract is ambiguous, however, "the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable." *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir.1988) (citing *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed.Cir.1987)); *see also Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1047–48 n. 4 (Fed.Cir.1994); *ThermoCor, Inc. v. United States*, 35 Fed.Cl. 480, 486 (1996).

In accord with the terms of the settlement agreement between the Massies and the government, the relevant portions of which are quoted above, JMW Settlements, Inc. purchased the annuity and structured payment products for the benefit of Autumn Massie from ELIC. On April 11, 1991, after ELIC experienced financial difficulties, the California Department of Insurance obtained a court order to place ELIC in conservation. Eventually, the California Superior Court approved a rehabilitation plan for ELIC, and all policy holders, annuitants, and contract

holders were offered an opportunity to participate in the plan. The Massies, through their attorney, elected to participate in the plan.

The Election Form submitted by the Massies to participate in ELIC's Rehabilitation Plan stated that participants "accept the Restructured Contract and the assumption of such contract by Aurora National Life Assurance company." The form further stated:

I recognize that by participating in the Rehabilitation Plan, except as expressly preserved under the Enhancement Agreement, I am releasing all Participating Guaranty Associations from all payments and claims other than those provided under the Enhancement Agreement. If the Participating Guaranty Association box indicates "NONE," I retain all rights to assert that I am a contract owner covered under any applicable Guaranty Association statute.

By participating in the Rehabilitation Plan, I accept the terms of the Rehabilitation Plan as approved by the Court, I realize that once I elect to participate and this form is received by ELIC, my decision is irrevocable.

The election form package mailed to the Massies also included a summary of the estimated account value or benefit level of the Massies' particular contract in a form titled "Contract Values Summary."

Plaintiff alleges that as a result of the restructuring of ELIC under the rehabilitation plan, plaintiff has not and will not receive the full value of the amounts due and owed under the settlement agreement. According to plaintiff, this constitutes a breach of contract by the government.[6] Plaintiff states that the operative language in the settlement agreement between the Massies and the United States is as follows:

the Offerees hereby agree to accept *this plan* in full satisfaction and final settlement of any and all claims, liens, rights or subrogated interests the Offerees now have or in the future may have against the United States, its officers, agents, or employees, for personal injury alleged to have resulted from medical malpractice during the birth of Autumn Massie at the United States Naval Hospital, Naples, Italy on June 8, 1983.

(emphasis added). Plaintiff asks this court to find that "this plan" consists of the entire five pages of the settlement agreement. According to the Massies, they did not agree to release their claim against the United States in exchange only for the government "pay[ing] to JMW Settlements, Inc., Washington, D.C., a sum not to exceed ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,-000.00)." Rather, according to the plaintiff, the bargain included a promise that the Massies would receive specific distributions, as described in the settlement agreement.

Plaintiff points out that the contract at issue was solely and exclusively between the plaintiff and the United States, and not between plaintiff and any third party. Moreover, according to the plaintiff, the government chose the manner in which to fulfill its obligations, by directing the purchase of an annuity from an insurance company rated A+ by A.M. Best. The plaintiff also suggests that the government could have sought contractual language stating that the offerees, by accepting the settlement agreement, understood that their sole and exclusive remedy would be against the annuity company, but that there is no such language in the contract at issue. Plaintiff points to language in the payment provisions of the settlement agreement that the annuity "will result" in the distributions specified, and that the monthly payments "are guaranteed." Thus, the plaintiff argues that the Massies contracted with the United States for the equivalent of an extended warranty as part of the settlement agreement.

Defendant argues that the United States specifically did not agree to cover any short-

---

**6.** As is discussed below, the court finds the defendant met its contractual obligations under the agreement and was not obligated under the settlement agreement to guarantee future payments. Therefore, no issue is presented to this court regarding whether the plaintiff's election to participate in the rehabilitation plan constituted a waiver and further release of the United States, as nothing remained from which to release the government.

falls in the distributions. Defendant points to language in the settlement agreement stating that the United States will pay "a sum *not to exceed* ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00)," [7] and suggests this means that there would be no future payments. (emphasis added). According to defendant, the government's obligations to the Massies under the settlement agreement are contained in subsections 1(a)–(c), wherein, the government agreed to: (a) make a lump sum payment to the Massies; (b) pay $350,000.00 into a Reversionary Medical Care Trust; and (c) purchase an annuity from an insurance company rated A+ which would result in certain monetary distributions.

Defendant also argues that the requirements placed on the annuity, including the payments that were to result from it, related only to actions that were to be undertaken at the time of purchase, and that when the annuity was purchased from ELIC, it was designed to provide the payments described in the settlement agreement. The current shortfalls, therefore, do not constitute a breach of contract with the plaintiff. As support of this argument, defendant contends that if one year after the execution of the settlement agreement the annuity were downgraded to B+ instead of A+, this would not be considered a breach of contract because the contractual requirements had been met at the time of performance. Accordingly, the current failure of the annuity to provide the payments specified is not a breach. In response to plaintiff's argument that the settlement agreement included an extended warranty, defendant argues that the stability of the annuity was addressed by the contractual provision requiring that the insurance company be rated A+, and that if plaintiff is correct, there would be no need for this provision.

After careful review of the settlement agreement and consideration of the parties' arguments, the court finds that the contractual language is not ambiguous and that the plain meaning of the contract supports the defendant's interpretation of its obligations.

The structure of the settlement agreement suggests that the affirmative obligations to the Massies to be performed by the United States appear in section 1 of the settlement agreement to the extent that "the United States will pay to JMW Settlements, Inc, Washington, D.C., a sum not to exceed ONE MILLION THREE HUNDRED THOUSAND DOLLARS AND NO CENTS ($1,300,000.00) to be used and distributed on behalf of the United States as follows." There appear to be three ways in which the $1,300,000.00 payment to JMW Settlements initially had to be utilized under the settlement agreement to directly benefit the Massies: a lump sum payment to the Massies; the establishment of a medical care trust; and the purchase of an annuity from an insurance company rated A+ which would result in distributions on behalf of the United States as set out below.

The only references to the United States contained in subsection 1(c) and the subparagraphs (i–iii), which follow, are that the annuity is to be owned by the United States and that the distributions are to be "on behalf of" the United States. Therefore, neither subsection 1(c) nor the subparagraphs (i), (ii), and (iii) place any affirmative obligations on the United States to make or guarantee payments resulting from the annuity.

In addition to the absence of specific contractual language requiring the United States to make up any shortfalls in future annuity payments once the annuity is purchased, language in the settlement agreement suggests that no such obligation was contemplated. Section 3 of the settlement agreement states as follows:

> In consideration for the *cash payments and the purchase of the funding annuity* referred to in paragraph one (1) above, the Offerees hereby release and forever discharge the United States, its officers, agents, and employees from all liability, claims, demands, or judgments or whatever nature arising from the incidents giving rise to the Offerees' administrative claim.

7. Although there is some question whether the government paid the full § 1,300,000, plaintiff is not alleging that the government breached this obligation.

(emphasis added). The cash payments and purchase of the funding annuity refer to the obligations described in subsections 1(a)–(c) of the settlement agreement, wherein the government was required to make a lump sum payment of $150,000.00 to the Massies, a payment of $350,000.00 into a medical care trust, and to purchase an annuity from an insurance company rated A+ which would result in distributions as described in the settlement agreement. Because the cash payments are mentioned before the annuity, they do not appear to refer to the payments under the annuity. Moreover, the use of the descriptive word "funding" as an adjective before the word "annuity" does not generate payment obligations upon the United States beyond the purchase of the annuity.

Regarding plaintiff's argument that the Massies contracted for an extended warranty in their settlement agreement, the plaintiff points to specific clauses and language, such as distributions "will result" and "monthly payments … are guaranteed," to support its contentions. In the absence of an immediate connection between these clauses and the United States, these terms do not appear to place a continuing obligation on the government, and plaintiff's argument is not persuasive. The phrase "will result" in connection with the distributions occurs in the same subsection (c) as the requirement that the insurance company be rated A+, and describes a requirement which applies to the time of purchase of the annuity and not to some future point in time.

The "guaranteed" language that plaintiff points to appears in the following context:

[1(c) ](i) Commencing one month from the date of purchase of the funding annuity, monthly payments in the amount of TWO THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($2,500.00) shall be paid to Autumn Massie or the guardian(s) of her life estate through the end of the twentieth (20th) year of the funding annuity. Commencing with the twenty-first (21st) year of the funding annuity, monthly payments n the amount of THREE THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($3,500.00) shall be paid to Autumn Massie or the guardian(s) of her life estate for the remainder of her life. The monthly payments provided for under this paragraph are *guaranteed* for fifteen (15) years.

(emphasis added). Plaintiff's argument that the use of the term "guaranteed" calls for the government to guarantee the payments made by ELIC takes the language out of context. In the first place, the "guarantee" is clearly limited to fifteen years. The above quoted provision provides for two different monthly payments, for the first twenty years for $2,500.00 and starting with the twenty-first year for $3,500.00. Second, under the terms of the settlement agreement, the annuity purchased must be structured to result in the distributions described; the United States is not mentioned as a guarantor of this annuity.

Defendant cites to a recent district court case which reviewed another settlement agreement involving ELIC, and which held that the obligation of the United States did not extend beyond purchasing the annuity. *Linebarger v. United States*, 927 F.Supp. 1280 (N.D.Cal.1996). Although the *Linebarger* opinion provides only portions of the settlement agreement language at issue in that case, those portions that are provided are similar to the language in the settlement agreement of the case at bar. In *Linebarger*, the settlement agreement provided that " '[d]efendant shall purchase an annuity contract with the Executive Life Insurance Company at a cost of $52,122.00,' " and described how the annuity funds would be disbursed once the United States had purchased the annuity. *Id.* In addition, the agreement at issue in the California case stated that " '[all] of the above distributions shall be based upon the date that the premium is paid and the contract is purchased and all such distributions *shall be guaranteed* to the plaintiff's estate.' " *Id.* (emphasis added). The *Linebarger* court found that the "guaranteed" language "clearly means that the annuity purchased was to provide for payments to plaintiff's estate should plaintiff die before the final payment. It is not intended to call for the government to guarantee annuity payments." *Id.* According to the *Linebarger* court, "[o]nce the United States purchased the annuity, the plaintiff was subject to the terms and conditions attached to the annuity by ELIC. The United States no longer had any authority regarding the annu-

ity." *Id.* The court finds the *Linebarger* court's reasoning helpful, if not persuasive.

In addition, plaintiff's argument that the settlement agreement called for the government to guarantee the annuity payments violates a basic principle of contract interpretation because it renders the requirement that the insurance company be rated A+ superfluous. Because the settlement agreement provided that any portion of the $1,300,000.00 remaining after the payments would be returned to the United States, the government would have had an incentive to purchase the cheapest annuity product, which could have been obtained more readily from a company rated less than A+. The requirement that the insurance company have the highest rating possible appears to have been designed to provide a measure of security for the annuity payments by ensuring that the company from which the annuity was purchased was as stable as possible. If the government were obligated under the settlement agreement to guarantee the monthly annuity payments, there would have been no need for such a provision and the annuity could have been purchased from an insurance company offering a cheaper rate.

## CONCLUSION

Based on a careful reading of the contract as a whole, the court finds that, according to the plain meaning of the settlement agreement, the United States was obligated to the plaintiff to the extent of making a lump sum payment to the Massies, creating a medical care trust, and establishing a funding annuity as described in the settlement agreement. The plain meaning of the settlement agreement does not support a finding that the government was obligated to guarantee the future annuity payment amounts after purchasing a funding annuity, regardless of subsequent events. The United States has fulfilled its obligations under the contract and thus there can be no breach of contract. Based on the above, the court **GRANTS** summary judgment to the defendant.

**IT IS SO ORDERED.**

