# United States Court of Appeals for the Federal Circuit

---

**KAREN L. SHAW, INDIVIDUALLY, AND KAREN L. SHAW, AS GUARDIAN OF THE PERSON OF RICHARD SCOTT SHAW, AN INCOMPETENT, RAYMOND A. SHAW, INDIVIDUALLY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-2136

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00783-MMS, Judge Margaret M. Sweeney.

---

Decided: August 20, 2018

---

CHARLES M. GRANOSKI, JR., Betzendorfer & Granoski, Anderson Island, WA, argued for plaintiffs-appellants.

MOLLIE LENORE FINNAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR., DEBORAH A. BYNUM.

---

Before LOURIE, DYK, and HUGHES, *Circuit Judges*.

DYK, *Circuit Judge*.

In 1985, Karen and Raymond Shaw entered into an agreement with the United States settling personal-injury claims arising from injuries to their son when he was born at a military hospital. The settlement provided for the purchase of several annuities that would make periodic payments to the Shaws. In 2012, however, the issuer of the annuities was liquidated, and the payments to the Shaws were substantially reduced.

The Shaws filed suit against the government in the United States Court of Federal Claims ("Claims Court") alleging a breach of their settlement agreement and seeking damages measured by the difference between the original payments and the reduced payments. The Claims Court found no breach and granted summary judgment in the government's favor. Because the agreement did not make the government a guarantor of the annuity payments, we affirm.

BACKGROUND

Richard Scott Shaw, known as Scotty, was born on July 4, 1979, at Madigan Army Medical Center in Washington State. He suffered significant injuries during childbirth, resulting in brain damage, cerebral palsy, seizures, and blindness, necessitating ongoing, around-the-clock care. The Shaws attributed these injuries to medical malpractice by military-hospital employees who provided the medical care, and they filed suit against the government in the United States District Court for the Western District of Washington under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680. After a bench trial, the district court found in favor of the Shaws, but its damages award was later reversed in part by the Ninth Circuit, which remanded to the district court for a

new damages assessment. *Shaw v. United States* (*Shaw I*), 741 F.2d 1202, 1205–10 (9th Cir. 1984).

While the case was on remand to the district court, the Shaws reached an agreement to settle their tort claims with the government. The Shaws "agree[d] to accept the compromise settlement . . . in full settlement and satisfaction of any and all claims . . . against the United States" concerning the events in question. J.A. 45. In return, the government agreed to make certain payments. Paragraph 4 of the agreement stated, in part:

> The payment by the United States of America of the cash sums set forth below in paragraph 5 and the purchase of annuities which will to [sic] provide certain future periodic payments as set forth below in paragraph 6 shall constitute a complete release . . . .

J.A. 45. Paragraph 5 went on to provide that the government would "make the following payments." J.A. 46. First, $500,000 to the Shaws; second, $500,000 to a medical trust set up for Scotty; third, $850,000 to the Shaws' attorneys; and fourth:

> To Merrill Lynch Settlement Services, Inc., for the purchase of annuities that will provide the periodic or other payments set forth in paragraph 6, below, the sum of $2,950,000.00.

J.A. 47. Paragraph 6 directed that "[t]he annuities purchased by the United States of America shall make the following payments," and it set forth the schedule and terms for said periodic payments. *Id.*

Four annuities are at issue here: one each payable to Mr. and Ms. Shaw, one to the guardianship for the benefit of Scotty, and one to the medical trust for the benefit of Scotty. The government made each of the payments specified in the agreement, including the payment of $2,846,095 to Merrill Lynch for the purchase of the annui-

ties. With respect to the monthly payments from the annuities payable to Mr. and Ms. Shaw, the agreement stated that these "are guaranteed for a period of twenty (20) years." J.A. 47–48. Finally, paragraph 7 noted that "[t]his compromise settlement is contingent on a total, final cost of $4,800,000.00." J.A. 49.

Merrill Lynch proceeded to purchase the annuities described in the agreement from Executive Life Insurance Company of New York ("ELNY"). Over the following decades, ELNY encountered financial difficulties and ultimately entered into court-ordered liquidation in 2012. Pursuant to the liquidation plan, the annuity payments to the Shaws were reduced by roughly 20%, and the payments to the guardianship and the medical trust were reduced by 62.4%.

In 2014, the Shaws filed suit in the Claims Court on behalf of themselves, Scotty, and the medical trust. They alleged that the government was in breach of its obligations under the settlement agreement by "failing to pay, or otherwise guarantee payment of, the reduction in the future monthly payments of the four annuities resulting from the liquidation of ELNY." J.A. 40. The parties agreed that there were no factual disputes as to liability, and they proceeded to file cross-motions for summary judgment on liability. The Claims Court granted summary judgment in favor of the government. *Shaw v. United States* (*Shaw II*), 131 Fed. Cl. 181, 208 (2017). The Claims Court determined that the government was obligated under the agreement to guarantee the annuity payments only for the first 20 years and that the reduction in payments had begun after that period. *See id.* at 202–07. It also determined that the Shaws lacked standing to sue on behalf of the medical trust because only the trustee was authorized to bring suit. *See id.* at 206–07.

The Shaws timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review the Claims Court's grant of summary judgment and its contract interpretation de novo. *Nw. Title Agency v. United States*, 855 F.3d 1344, 1347 (Fed. Cir. 2017). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*; *accord* RCFC 56(a).

I

This is the third case that has come before our court concerning the government's obligations with respect to annuities purchased from ELNY pursuant to settlement agreements from the 1980s. *See Nutt v. United States*, 837 F.3d 1292 (Fed. Cir. 2016); *Massie v. United States* (*Massie II*), 166 F.3d 1184 (Fed. Cir. 1999). The settlement agreements in these cases were different, and in the first two cases we reached different results—in *Massie II*, holding that the government was obligated to guarantee the payments, 166 F.3d at 1190, and in *Nutt*, that there was no such obligation, 837 F.3d at 1297–99. Because these cases guide our decision here, some background is helpful.

*Massie II* involved injuries suffered during childbirth at a military hospital. 166 F.3d at 1186. The resulting tort claims were brought pursuant to the Military Claims Act. *Id.* The parties reached a settlement. *Id.* It provided that a broker was to purchase an annuity that, according to the agreement, would "be owned solely and exclusively by the United States [and] which will result in distributions on behalf of the United States." *Massie v. United States* (*Massie I*), 40 Fed. Cl. 151, 155 (1997), *rev'd*, *Massie II*, 166 F.3d 1184. With respect to some of the periodic payments to be made by the annuity, the settlement agreement provided a schedule and then directed that the "payments provided for . . . are guaranteed for fifteen (15) years." *Id.* With respect to other

payments, the agreement stated that the "payments provided for . . . are guaranteed." *Id.* at 156. Still other payments had no provision using guarantee language. *See id.* With respect to each of the future payments, the agreement directed that they "shall be paid" on the relevant dates. *Id.* at 155–56.

We held that the contract obligated the government to cover the shortfall in the payments caused by the insurer's liquidation. *Massie II*, 166 F.3d at 1187, 1189–90. In finding that the agreement was "unambiguously mandatory" and that "the government must be responsible for their payment," we relied on two portions of the above-quoted language. *Id.* at 1190. In particular, we looked to "[t]he language specifying that the annuity 'will result in distributions'" on behalf of the United States "and that the disbursements 'shall be paid.'" *Id.* We did not rely on the use of the word "guaranteed." *See id.* at 1189–90.

*Nutt* involved FTCA claims arising after a U.S. Army vehicle struck and killed Mr. Nutt, the husband and father of the plaintiffs. 837 F.3d at 1293. The parties reached a settlement pursuant to which "the United States of America agree[d] to purchase annuities which w[ould] pay" a series of periodic and lump-sum payments. *Id.* at 1296. None of the payment provisions used the term "guaranteed." *See id.* With respect to each of the future payments, the agreement directed that they "shall be paid" on the relevant dates. *Id.* The agreement further provided that the government would select an insurance company with a rating at or above excellent and that, in the event of a default by the insurer, the government would "assist [Plaintiffs] . . . in the prosecution of" a suit for breach of contract. *Id.* at 1297 (first alteration in original).

We held that the contract did not obligate the government to cover the shortfall in the payments caused by the insurer's receivership. *Id.* at 1297–99. The agree-

ment stated that the periodic payments would be paid by the annuity, and the government "[wa]s not mentioned in the paragraphs specifying the future payments to be paid out by the annuity," *id.* at 1297, and the language "on behalf of the United States" was absent. This understanding was buttressed by the agreement's provisions for the insurer's default, which contemplated government assistance but not government liability. *Id.* at 1298–99.

In *Nutt*, we distinguished *Massie II*, in part, on the ground that the agreement in *Massie* used the term "guaranteed" to refer to the periodic payments, whereas the agreement in *Nutt* did not. *Id.*

## II

In this case, the Claims Court ruled that the government had no obligation with respect to the shortfall caused by the insurer's liquidation. *Shaw II*, 131 Fed. Cl. at 204–08. We agree, but we disagree in part with the Claims Court's reasoning.

The Shaws argue that the use of the term "guaranteed" in the agreement supports their position that the government is obligated to guarantee the annuity payments. For example, the agreement stated, with respect to the monthly payments to be made to Raymond Shaw:

> To Raymond A. Shaw, the sum of $4,166.00 each month, continuing for the life of Raymond A. Shaw. These monthly payments are guaranteed for a period of twenty (20) years; thus, should Raymond A. Shaw die before the 240th payment, then the payments set forth herein shall be paid, as they become due, to his estate through and including the 240th payment. Should Raymond A. Shaw die after the 240th payment, the payments set forth herein shall ceases [sic].

J.A. 47. The agreement provided the same with respect to the monthly payments to Karen Shaw. *Id.* at 47–48. On

this basis, the Claims Court found that the agreement would have obligated the government to cover any short-fall in the first 20 years of payments but that the reductions began after that period had already ended. *See Shaw II*, 131 Fed. Cl. at 205, 207–08.

In reaching this conclusion, the Claims Court relied on *Nutt*, which, in part, distinguished *Massie II* on the basis that the *Massie* agreement contained a similar use of the term "guaranteed" with respect to some of the annuities. *See id.* at 205. We think relatively little significance can be given to this guarantee language. In the context of annuities, "guaranteed" is generally used as a term of art to establish that an annuity that is measured by an annuitant's life will continue to make payments in the event of death before the end of the guaranteed period.[1] In the Shaws' agreement, the use of

---

[1]    *See, e.g.*, *Foisy v. Royal Maccabees Life Ins.*, 356 F.3d 141, 145 n.5 (1st Cir. 2004) ("A certain and continuous annuity provides a minimum number of guaranteed payments, regardless of whether the annuitant dies before the minimum payments are complete. If the annuitant outlives the guaranteed minimum, payments will continue for life, ending upon the death of the annuitant."); 3 Michael B. Snyder, *Compensation and Benefits* § 36:88 ("Under a term certain and life annuity, payments are guaranteed for a stated period of time but are otherwise payable for the life of the participant. If the participant is alive when the stated period of time ends, the payments occur until the participant's death. If the participant dies before the stated period, the payments continue to a named beneficiary for the remainder of the guaranteed period."); 3 Jacob A. Stein, *Stein on Personal Injury Damages* § 16:73 ("Generally, a reasonable guarantee period of 10–15 years is usually insisted upon by most plaintiffs' attorneys. This insures that a minimum of

the term "guaranteed" indicates that the monthly payments will be made until 20 years have passed or until the death of the annuitant, whichever is later. Indeed, the second and third sentences of the provision explained exactly how that guarantee will function.

Turning to the rest of the agreement's language and our prior cases, we think the agreement in this case is distinguishable from the one in *Massie*. The *Massie* agreement described the periodic payments as being made "on behalf of the United States," *Massie I*, 40 Fed. Cl. at 155, suggesting an ongoing obligation of the government. The agreements here and in *Nutt* contained no such language, simply stating that the annuities shall make the payments. *See* J.A. 47 ("The annuities purchased by the United States of America shall make the following payments: . . . ."); *Nutt*, 837 F.3d at 1296 ("[T]he United States of America agrees to purchase annuities which will pay the following amounts: . . . ."). Moreover, the Shaws' agreement stated that "[t]he payment by the United States of America of the cash sums set forth below in paragraph 5 [(i.e., the initial lump sums)] and the purchase of annuities which will to [sic] provide certain future periodic payments as set forth below in paragraph 6 shall constitute a complete release" of the Shaws' claims. J.A. 45. The agreement did not provide that the payments made by the annuities would discharge the government's obligations. *See id.*

Thus, the Shaws' agreement, even more than the one at issue in *Nutt*, unambiguously cabined the government's obligations to the initial lump-sum payments and the purchase of the annuity and did not obligate it to guarantee the future payments by the annuities. We reach this conclusion even in the absence of language, present in

future payments will be paid. This minimum payout provides payments to the heirs of the now-dead payee.").

*Nutt*, concerning the insurer's rating and the government's role in the event of the insurer's default, which supported but was not necessary to the result in *Nutt*. *See Nutt*, 837 F.3d at 1298. Because the agreement is unambiguous in this respect, we need not consider the extrinsic evidence offered by the Shaws. *E.g., id.* at 1296.

CONCLUSION

Because the Shaws' agreement did not obligate the government to act as a guarantor of the future periodic annuity payments, we affirm the Claims Court's grant of summary judgment to the government.[2]

**AFFIRMED**

COSTS

No costs.

---

[2] The parties dispute whether Ms. Shaw has standing to pursue a claim on behalf of the medical trust established for her son. Because there is no dispute that the Shaws have standing to assert their claims as individuals and as their son's guardian, we have reached the merits and need not decide the separate standing question. *See, e.g., Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017); *Tierney v. Advocate Health & Hosps. Corp.*, 797 F.3d 449, 451 (7th Cir. 2015); *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957 n.2 (Fed. Cir. 1992).