# United States Court of Appeals for the Federal Circuit

---

**TREVOR LANGKAMP,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-2052

---

Appeal from the United States Court of Federal Claims in No. 1:15-cv-00764-LKG, Judge Lydia Kay Griggsby.

---

Decided: November 27, 2019

---

JAMES H. LISTER, Birch, Horton, Bittner & Cherot, PC, Washington, DC, argued for plaintiff-appellant.

MOLLIE LENORE FINNAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, DEBORAH ANN BYNUM, ROBERT EDWARD KIRSCHMAN, JR.

---

Before LOURIE, MAYER, and TARANTO, *Circuit Judges*.

MAYER, *Circuit Judge*.

Trevor Langkamp appeals the judgment of the United States Court of Federal Claims granting the government's motion for summary judgment and rejecting his claim seeking damages for breach of a tort settlement agreement. *See Langkamp v. United States*, 131 Fed. Cl. 85 (2017) ("*Court of Federal Claims Decision*"). Because we conclude that the court erred in holding that the United States had no continuing liability for the future monthly and periodic lump-sum payments specified in the agreement, we reverse and remand.

## BACKGROUND

In 1980, Langkamp, who was then a toddler, suffered severe burn injuries at a property owned and operated by the United States Army. Langkamp's parents, Joseph and Christina Langkamp, subsequently brought an action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, in the U.S. District Court for the Western District of Michigan. On November 15, 1984, the parties entered into a settlement agreement (the "Settlement Agreement"). That agreement, in pertinent part, provides:

*STIPULATION FOR COMPROMISE SETTLEMENT*

IT IS HEREBY STIPULATED by and between the plaintiffs, Joseph P. Langkamp, et al., and the defendants, United States of America and United States Department of Army, by and through their respective attorneys, as follows:

1. That the parties do hereby agree to settle and compromise the above-entitled action upon the terms indicated below.

2. That the defendants, United States of America and United States Department of Army, will pay to the plaintiffs, Joseph P. Langkamp, et

al., in their own right, the sum of $239,425.45 as an upfront payment which includes attorney fees and costs and a structured settlement for the benefit of Trevor Langkamp, which sum shall be in full settlement and satisfaction of any and all claims said plaintiffs now have or may hereafter acquire against the defendants, United States of America and United States Department of Army, on account of the incident or circumstances giving rise to this suit.

3. That the aforesaid amount shall be paid as follows: $350.00 per month beginning by the beginning of January, 1985[,] through October 15, 1996, then $3,100.00 per month, 3 percent compounded annually for life, guaranteed for 15 years, beginning November 15, 1996, and Lump Sum Payments as follows:

| | | |
|---|---|---|
| $15,000.00 | on | December 15, 1996 |
| 50,000.00 | on | December 15, 2000 |
| 100,000.00 | on | December 15, 2008 |
| 250,000.00 | on | December 15, 2018 |
| 1,000,000.00 | on | December 15, 2028 |

4. That the plaintiffs hereby agree to accept said sum in full settlement and satisfaction of any and all claims and demands, including attorney[] fees and any other costs of this action, which it or its agents or assigns may have against the defendants, United States of America and United States Department of Army, and its agents and employees on account of the incident or circumstances giving rise to this suit.

5. That this agreement shall not constitute an admission of liability or fault on the part of the defendants, United States of America and United States Department of Army, or on the part of its agents or employees.

6.  That in exchange for the payment of the sum stated above and contemporaneous with the delivery of the check therefor, plaintiffs will file with the Clerk of the above Court a dismissal of the above action with prejudice and without costs, and will execute and deliver to the defendants, United States of America and United States Department of Army, a full and final release of any and all claims set forth in paragraphs 2, 3 and 4 above, against the United States of America and United States Department of Army and its agents and employees.

J.A. 133–35.

After execution of the agreement, the government issued a check for $239,425.45 payable to Joseph and Christina Langkamp, as guardians of Langkamp, and a check for $160,574.55 payable to JMW Settlements, Inc. ("JMW"), an annuity broker. On November 30, 1984, JMW purchased two single-premium annuity policies from Executive Life Insurance Company of New York ("ELNY") to fund the monthly and periodic lump-sum payments delineated in paragraph three of the Settlement Agreement. The Langkamps thereafter stipulated to the dismissal of their FTCA action and executed a release of their tort claims against the United States.

For nearly thirty years, from January 1985 to July 2013, ELNY sent Langkamp the monthly and periodic lump-sum payments specified in the Settlement Agreement. Following ELNY's insolvency and court-approved restructuring, however, Langkamp's structured settlement payments were reduced to approximately forty percent of the original payment amount. Langkamp, through counsel, then contacted the government, explaining that as a result of ELNY's insolvency he was no longer receiving the full payments required by the Settlement Agreement and asserting that the United

States bore responsibility for the shortfall in payments. After the United States denied liability, Langkamp filed suit in the Court of Federal Claims.

The Court of Federal Claims rejected Langkamp's argument that the United States had continuing liability for the monthly and periodic lump-sum payments set forth in the Settlement Agreement. *See Court of Federal Claims Decision*, 131 Fed. Cl. at 93–97. In the court's view, the government fulfilled its responsibilities under the agreement when it disbursed the required upfront payment and purchased annuities on Langkamp's behalf. *Id.* at 94–95. The court determined that the United States had no obligation to cover the shortfall in payments which occurred in the wake of ELNY's insolvency because there was "no language in the Settlement Agreement that expressly and unequivocally require[d] that the government guarantee the monthly and periodic lump-sum payments delineated in that agreement." *Id.* at 95.

The court further determined that "the government could not have entered into a contract that requires [it] to pay more than the $400,000 disbursed at the time of settlement to resolve [Langkamp's] FTCA claim." *Id.* at 96. According to the court, because "the government disbursed this authorized amount in 1984, in the form of a one-time, lump-sum payment of $239,425.45 and by paying a structured settlement broker $160,574.55 to purchase two structured settlement annuities for the benefit of [Langkamp]," it could not have been legally bound by a contract additionally requiring it to guarantee any shortfalls in annuity payments. *Id.* at 96–97.

After Langkamp's motion for reconsideration was denied, he filed a timely appeal with this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

DISCUSSION

I. Standard of Review

Contract interpretation is a question of law which we review de novo. *See, e.g.*, *Dobyns v. United States*, 915 F.3d 733, 738 (Fed. Cir. 2019); *Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1364–65 (Fed. Cir. 2007). We likewise review de novo the grant of summary judgment by the Court of Federal Claims. *See TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006). "Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003).

II. The Settlement Agreement

"Contract interpretation begins with the plain language of the written agreement." *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002). Here, both parties assert that the language of the Settlement Agreement unambiguously supports their respective positions. The government contends that while the agreement required it to purchase structured settlement annuities on Langkamp's behalf, it does not impose any continuing liability to make or guarantee future payments. In Langkamp's view, however, the Settlement Agreement unambiguously obligates the United States to ensure that all future monthly and periodic lump-sum payments are properly disbursed.

We agree with Langkamp. Paragraph two of the relatively succinct Settlement Agreement states that the United States "will pay": (1) an "upfront payment" of $239,425.45; and (2) a "structured settlement for the benefit of Trevor Langkamp." J.A. 133. Paragraph three then delineates how "the aforesaid amount shall be paid," providing a detailed schedule of required future monthly

and periodic lump-sum payments. J.A. 134. Unlike previous cases in which tort settlement agreements explicitly referenced a third-party payor, such as an insurance company, and the purchase of annuities, *see Shaw v. United States*, 900 F.3d 1379, 1381 (Fed. Cir. 2018); *Nutt v. United States*, 837 F.3d 1292, 1296–97 (Fed. Cir. 2016), the agreement here contains no reference to a third-party payor but instead places the onus on the government to ensure the disbursement of future payments. *See Shaw*, 900 F.3d at 1382 (explaining that whether the government is obligated to cover future periodic payments under a settlement agreement following an insurer's insolvency turns on the specific language of the agreement).

In *Nutt*, the parties settled an FTCA claim by entering into an agreement stating that the United States "agree[d] to purchase annuities" which would make specified future payments to the plaintiffs. 837 F.3d at 1296. The agreement further provided that the insurance company selected by the government "for the purchase of the annuities w[ould] be one which [was] generally regarded as very sound in the insurance industry." *Id.* at 1297. We concluded that the "fairest reading" of this contract language was that "the Government did not agree to pay future sums, but agreed only to purchase annuities." *Id.* (citation and internal quotation marks omitted). In support, we noted that the agreement stated that the government would furnish the plaintiffs with "a certificate of insurance or other evidence of the *purchase by the United States of annuities* in an amount sufficient to satisfy those obligations under the settlement agreement *which are to be satisfied by the purchase of the annuities*." *Id.* at 1298 (citation and internal quotation marks omitted). This provision, we explained, made clear "that the Government's obligations with respect to the future sums that were to be made by the annuities were satisfied 'by the purchase of the annuities.'" *Id.* (citation omitted).

We confronted similar contract language in *Shaw*. There the settlement agreement stated that the plaintiffs agreed to release their FTCA claims against the United States in exchange for initial cash disbursements and a promise by the government to pay nearly $3 million "[t]o Merrill Lynch Settlement Services, Inc., for the purchase of annuities" which would make specified future periodic payments. *Shaw*, 900 F.3d at 1381. We concluded that this language "unambiguously cabined the government's obligations to the initial lump-sum payments and the purchase of the annuit[ies] and did not obligate it to guarantee the future payments by the annuities." *Id.* at 1384.

Because the government's duty under the settlement agreements in *Nutt*, 837 F.3d at 1294, and *Shaw*, 900 F.3d at 1381, was to "purchase" annuities on the plaintiffs' behalf, we determined that they imposed no further obligation to guarantee future payments if the insurance companies that provided those annuities defaulted. Here, by contrast, the Settlement Agreement contains no reference to the purchase of an annuity from a third party, but instead explicitly requires the United States to "pay . . . a structured settlement." J.A. 133. Simply put, whereas the agreements in *Nutt* and *Shaw* conditioned the release of tort claims on the government's promise to purchase annuities from a third party, the agreement here conditions the release from liability on the promise to disburse specified structured settlement payments.

## III. Structured Settlements

The Court of Federal Claims determined that the government had no continuing responsibility to ensure future payments to Langkamp because the Settlement Agreement uses the term "structured settlement," J.A. 133, and that term "is generally recognized to mean a legal settlement paid out as an annuity rather than as a lump sum," *Court of Federal Claims Decision*, 131 Fed. Cl. at 94.

In other words, according to the court, because the Settlement Agreement calls for the payment of a "structured settlement" and a structured settlement is frequently paid out as an annuity, the agreement implicitly cabins the government's responsibility to the purchase of annuities. *Id.* at 94–95.

We do not find this reasoning persuasive. The term "structured settlement" generally refers to a tort settlement which requires a defendant to make a sequence of payments over time. *See, e.g.*, *W. United Life Assurance Co. v. Hayden*, 64 F.3d 833, 839 (3d Cir. 1995) ("[I]n a structured settlement the claimant receives periodic payments rather than a lump sum, and all of these payments are considered damages received on account of personal injuries or sickness and are thus excludable from income."); *Godwin v. Schramm*, 731 F.2d 153, 157 (3d Cir. 1984) ("Generally, a structured settlement entails a cash payment made on settlement, sufficient to cover at least special damages such as medical bills incurred and past lost wages, and guaranteed periodic payments in the future."); *321 Henderson Receivables Origination LLC v. Sioteco*, 93 Cal. Rptr. 3d 321, 325 (Cal. Ct. App. 2009) ("[I]n a structured settlement the claimant receives periodic payments rather than a lump sum."); Lawrence G. Cetrulo, 2 Toxic Torts Litigation Guide § 16.31 (2018) ("A 'structured settlement' is a plan to compensate a claimant over time for his or her loss as distinguished from the traditional single, lump-sum payments used to settle most cases. While the most prominent and frequently used feature of a structured settlement is future payments for a fixed period of time, most structured settlements also provide for an immediate cash payment to the claimant for past expenses, current bills, attorneys' fees, and other immediate needs." (footnotes omitted)); Guy Kornblum & Matthew Garretson, 1 Negotiating and Settling Tort Cases § 18:1 (2009) ("Kornblum") ("By definition, a structured settlement describes compensation for a

personal injury claim in which at least part of the settlement is paid over time, rather than with one lump sum. In lieu of receiving all monies up front, the claimant receives instead a promise from an entity to make future payments according to an agreed-upon schedule."). Therefore, the fact that the Settlement Agreement recites that the United States will "pay . . . a structured settlement," J.A. 133, means that the government is required to make payments over time, not that an unnamed third party will have sole responsibility for future periodic payments.

The stream of future periodic payments required under a structured settlement agreement is often—but not necessarily—funded through the purchase of an annuity. *See, e.g.*, Jacob A. Stein, 3 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 16:1 (3d ed. 2016) ("The payments [under a structured settlement] are normally funded using an annuity or obligations of the United States."); Kornblum, *supra*, at § 18:2 (explaining that although the future payments required by a structured settlement can be funded through the purchase of an annuity, they can also be funded through "a trust that is set up with a bank as administrator which purchases government bonds to generate income to make periodic payments over the life of the injured claimant"). But the fact that payments under a structured settlement agreement can be funded through the purchase of an annuity does not resolve the dispositive issue presented here—which is whether the specific language of an agreement imposes an obligation on a defendant to make periodic payments independent of any such purchase. *See* Kornblum, *supra*, at § 18:1 ("A structured settlement is not an actual financial product; rather, it is a specific agreement."). Here, because the Settlement Agreement makes the government's duty to disburse specified sums "unambiguously mandatory," its contractual responsibilities were not extinguished by the purchase of annuities. *Massie v. United States*, 166 F.3d

1184, 1190 (Fed. Cir. 1999); *see also W. United Life*, 64 F.3d at 840 ("[U]nder a structured settlement the obligor has a continuing obligation to pay the periodic payments to the recipient. The annuity is merely a convenient funding mechanism and does not alter this obligation.").

## IV. The Government's Contentions

The government resorts to linguistic contortions in its effort to circumvent the plain language of the Settlement Agreement. It first asserts that "[t]he agreement does not obligate the Government to 'pay' the periodic installments set forth in . . . paragraph [three]; to the contrary, paragraph [three] provides that those installments 'shall be paid' but does not assign the payment obligation to the United States." Br. of Defendant-Appellee at 19 (quoting J.A. 133–34). This argument is a non-starter. Paragraph two of the agreement unambiguously obligates the United States to "pay . . . a structured settlement for the benefit of Trevor Langkamp," J.A. 133, and paragraph three delineates the schedule under which "the aforesaid amount shall be paid," J.A. 134. There is no language in paragraph three even arguably suggesting that an unnamed third party, such as an insurance company, will be solely responsible for making the future monthly and periodic lump-sum payments listed in that paragraph.*

The government further contends that the Settlement Agreement evinces an intent to discharge all payment

---

\* Nor does the fact that paragraph three states that certain monthly payments are "guaranteed for [fifteen] years," J.A. 134, mean that the government has no liability for payments due after expiration of this fifteen-year period. As we explained in *Shaw*, such "guarantee" language, as a general rule, merely indicates that certain payments will continue even if the injured claimant dies within the guarantee period. 900 F.3d at 1383–84.

obligations in 1984, and that paragraph six of the agreement accordingly limits the government's liability to the disbursement of an initial cash payment and the purchase of annuities on Langkamp's behalf. In the government's view, "even if paragraph [three] could be read to contemplate a continuing obligation" on its part, "paragraph [six] would reflect the parties' intent that such obligation would be satisfied and superseded by the delivery of the structured settlement annuities." Br. of Defendant-Appellee at 20. We disagree. Although paragraph six refers to the delivery of a single "check," J.A. 134, it does not mention structured settlement annuities or suggest that Langkamp's release of his tort claims against the United States is contingent upon the delivery of such annuities. Even more fundamentally, "[w]e must interpret [a] contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("When interpreting [a] contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."). Considered as a whole, the Settlement Agreement plainly ties the government's release from liability to its promise to disburse both an initial cash payment and specified future structured settlement payments. *See* J.A. 133 ("[T]he defendants . . . will pay to the plaintiffs . . . the sum of $239,425.45 as an upfront payment . . . and a structured settlement for the benefit of Trevor Langkamp, which sum shall be in full settlement and satisfaction of any and all claims said plaintiffs now have or may hereafter acquire against the defendants . . . on account of the incident or circumstances giving rise to this suit."); J.A. 134 (providing a schedule of future monthly and periodic lump-sum payments and stating that "the plaintiffs hereby agree to accept said sum in full settlement and satisfaction of any and all claims and

demands . . . which it or its agents or assigns may have against the defendants").

## V. Settlement Authority

The government additionally contends that if the Settlement Agreement is ambiguous it should be interpreted in a manner that preserves its enforceability. In its view, Langkamp's reading of the agreement—which imposes continuing liability for future payments—would render it unenforceable because the Assistant U.S. Attorney who signed the agreement on the government's behalf had no authority to settle Langkamp's claim for more than $400,000, J.A. 136–40, 162. This argument falls flat. As a preliminary matter, we discern no ambiguity regarding the government's payment obligations under the Settlement Agreement; it means what it says when it requires the United States to "pay . . . a structured settlement" to Langkamp. J.A. 133.

Even if we were to assume *arguendo*, moreover, that there is some ambiguity in the contract language, there is no indication that in 1984 the present value of the government's obligations under the Settlement Agreement—including the initial cash payment and the stream of scheduled future payments—exceeded the settlement authority delegated to the Assistant U.S. Attorney. In this regard, the "'total present value' of a payment stream plausibly refers to its cost, not to the amount a beneficiary receives." *Ezell v. Lexington Ins. Co.*, 926 F.3d 48, 50 (1st Cir. 2019); *see also Old Republic Ins. Co. v. Ashley*, 722 S.W.2d 55, 57 (Ky. Ct. App. 1986) (explaining that although certain annuities had "an estimated yield of $2,853,000," they had a "present value of . . . $732,000"). Here, after disbursing the required "upfront payment" of $239,425.45, J.A. 133, the government spent $160,574.55 to purchase two single-premium annuity policies from ELNY, policies which promised to make all the monthly and periodic lump-sum

payments delineated in paragraph three of the Settlement Agreement.** J.A. 139, 144–62. The fact that in 1984 it cost the government approximately $160,000 to obtain a promise from an insurance company to fund the future payments specified in the Settlement Agreement is a strong indicator that the present value, at the time of the agreement, of the government's own promise to make such payments did not exceed that amount. *See, e.g.*, *Wyatt v. United States*, 783 F.2d 45, 47 (6th Cir. 1986) (explaining that "absent the submission of any contrary evidence the present value of [a] structured settlement" is "the *cost* of that settlement, namely, what it took in money to produce the agreed settlement payments over the entire period involved"); *Old Republic*, 722 S.W.2d at 58 (stating that "[t]he prevailing law is that a structured settlement should be valued at its present cash value"); *Merendino v. FMC Corp.*, 438 A.2d 365, 368 (N.J. Super. Ct. Law Div. 1981) (concluding that "the cost of the annuities reflect[ed] the actual present value in the marketplace"). We have considered the government's remaining arguments but do not find them persuasive.

CONCLUSION

Accordingly, the judgment of the United States Court of Federal Claims is reversed and the case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**

COSTS

Langkamp shall have his costs.

---

** As we explained in *Nutt*, "periodic damage awards under the FTCA may be permissible in lieu of lump-sum payments . . . by agreement of the parties." 837 F.3d at 1296.