NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————————

**STARWALKER PR LLC,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY, SECRETARY OF DEFENSE,**
*Appellees*

———————————————

2020-2024

———————————————

Appeal from the Armed Services Board of Contract Appeals in Nos. 60485, 60775, Administrative Judge J. Reid Prouty, Administrative Judge Richard Shackleford, Administrative Judge Timothy Paul McIlmail.

———————————————

Decided:  September 22, 2021

———————————————

MATTHEW JAMES DOWD, Dowd Scheffel PLLC, Washington, DC, argued for appellant.  Also represented by ROBERT JAMES SCHEFFEL; MICHAEL J. SCHAENGOLD, Greenberg Traurig, P.A., Washington, DC.

DOMENIQUE GRACE KIRCHNER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellees.  Also

represented by BRIAN M. BOYNTON, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY.

————————————

Before PROST, CHEN, and HUGHES, *Circuit Judges*.

CHEN, *Circuit Judge*.

The Armed Services Board of Contract Appeals (Board) held that the base-year Host Nation Trucking (HNT) contract between Starwalker PR LLC[1] (Starwalker) and the Government did not obligate the Government to pay Starwalker for "backhaul" trips that were not directed by the Government on an official Logistics Movement Request (LMR) or Transportation Movement Request (TMR). Because we agree with the Board that the contract language unambiguously requires the Government to pay only for transport movement requested via an LMR or TMR, we *affirm*.

BACKGROUND

A

In March 2009, Starwalker and the Government entered into HNT contract number W91B4N-09-D-5005 (Contract). The purpose of the Contract was for Starwalker to provide "logistics support and management necessary" to move material and cargo to and from various sites in Afghanistan. *See* J.A. 170. The base period of the Contract

————————————

[1]     Starwalker PR LLC is the successor to several companies, including those that performed the trucking services pursuant to the contract at issue. All claims against the Government for unpaid compensation under the Contract were assigned to Starwalker PR LLC. For ease of reference, we refer to Starwalker PR LLC and its predecessors collectively as Starwalker herein.

ran from March 16, 2009 to March 15, 2010, and the Contract included an option for one additional year.

The Contract stated that the Government would order Starwalker to undertake operations as specified or directed on an LMR or TMR. Each LMR or TMR—referred to by Starwalker as "mission sheets"—listed the origin from which Starwalker was to pick up cargo, the destination, and indicated whether a return trip was authorized. *See, e.g.*, J.A. 2058, 2060. Each mission sheet required a signature from the appropriate Government Point of Contact at both the origin and the destination. *See id.*; J.A. 179 (§ 4.11.1). The provisions in the Contract's Statement of Work (SOW), through which the Government directed Starwalker's movements, included in relevant part:

> **1.3 Compliance.** Contractor must comply with all movement requirements in theater to include but not limited to the Logistics Movement Request/Transportation Movement Request (LMR/TMR) process, in coordination with the Joint Movement Control Battalion (JMCB).

J.A. 170.

> **4.1 Delivery Locations**. Contractor shall operate convoys to and from any location within the Afghanistan Theater of Operations, as directed on the official LMR/TMR, and issued through the JMCB.

J.A. 175.

> **4.10 Backhaul/Retrograde Operations**. Contractor shall pick up and deliver equipment and resources associated with backhaul/retrograde operations to and from any location within the Afghanistan Theater of Operations as indicated on an official LMR/TMR.

J.A 179.

The base-year Contract did not define backhaul, but the undisputed common meaning of the word "backhaul" is movement of a vehicle from its destination point—i.e., where it was ordered to deliver cargo—to its origin. *See* Appellant's Br. 12; Appellee's Br. 7–8; J.A. 905; Oral Arg. at 22:38–22:57 (counsel for the Government agreeing "that backhaul is returning to the point of origin").

The Contract also specified that Starwalker was permitted to invoice the Government only for services "directed by the Government." Section E-1 of the Contract, entitled "Invoicing," stated:

> The contractor shall only invoice for days of actual service performance. Specifically, time spent for mobilization, demobilization, rest and relaxation, sick leave or any event not directed by the Government shall not be included as a day of services for the purposes of invoices submitted to the Government.

J.A. 136.

As § E-1 suggests, compensation for trucking services was determined by the number of "days" required for each mission. Section 4.2 of the SOW further provided in relevant part:

> **4.2 Mission Days.** One mission day will be allowed for every 200 km of distance traveled within Afghanistan.

J.A. 175.[2]

---

[2]    Appendix A of the Contract includes a Price Schedule that detailed the rates for each mission day for various types of trucks during the contract term. J.A. 132–35.

After cargo was delivered to its destination, the Contract required Starwalker to return the original, signed mission sheets to the Project Manager "upon mission completion." *See* SOW § 4.11.1:

> **4.11.1 Cargo Documentation**. Contractor shall present shipping documentation to the authorized [Point of Contact] at final destination for signature. If a signature cannot be obtained, [Convoy Team Leader] will sign in lieu of the destination [Point of Contact]. The [Convoy Team Leader] will document any names and/or other critical information pertinent to why the appropriate signature could not be obtained. Contractor shall return all shipping documentation immediately to the [Program Manager] upon mission completion.

J.A. 179.

As part of the bidding and solicitation process, Starwalker sought clarity about compensation under SOW § 4.10 (Q&A 34). Starwalker asked the Government: "Will backhaul/retrograde operations be charged short haul and long haul mission rates? (Ref: 4.10)," and the Government replied "Backhaul/retrograde operations will be counted in accordance with SOW para 4.2." J.A. 635.

B

Shortly after Starwalker began performance of the Contract, a dispute arose about whether backhaul not explicitly directed on a mission sheet were compensable. *See, e.g.*, J.A. 843–48. Starwalker claimed that § 4.11.1 of the SOW directed each truck to return to the Project Manager's location, i.e., the point of origin in most cases, after cargo delivery. *See* J.A. 876 ("The [Government] requires each [contractor] to return an Original Mission Sheet in for validity at Close Out. This in essence is the **Government directing us** to return to the carriers home location."). In effect, Starwalker claimed it was due nearly twice the

compensation it was paid by the Government, because the contract purportedly required the Government to pay for cargo-less trucks to return to their point of origin. *See* J.A. 863. According to Starwalker, the Government's position was that compliance with SOW § 4.11.1 did not require the return of the actual truck to the origin or Program Manager, just the mission sheets. *See* J.A. 876.

The Government exercised the option year of the Contract despite the dispute over backhaul but modified several contract provisions. The Government modified § 4.10 for the option year to state:

> **4.10 Backhaul**. Backhaul is the return movement of a truck, without [Government] cargo, from the point of delivery to the origination point, or any another point as determined by the Contractor. Backhaul is not compensated by the [Government], unless specifically negotiated by the MCB in advance of movement. If a truck uploads new cargo following a download at a point of delivery, the movement of the truck to a new point of delivery will be as directed on an official LMR/TMR and the terms of this contract.

J.A. 244.

The Government also modified SOW § 4.2 for the option year by adding language stating that "[a] day is only considered a mission day when the truck is moving cargo, unless otherwise directed by MCB. Absent MCB direction, if the Contractor is not moving cargo, it is not considered a mission day." J.A. 239–40.

C

In December 2015 and May 2016, Starwalker submitted claims to the contracting officer for "unpaid backhaul charges" during the base and option years, respectively. Although the Contract for the option year expressly forbade invoicing for backhaul, Starwalker claimed it was

coerced into signing the contract modification by the Government and thus was due compensation for backhaul under the base year contract language. *See* J.A. 658–59. The contracting officer did not respond to Starwalker's base-year claim, rendering it rejected, and rejected Starwalker's option-year claim in June of 2016. *See* J.A. 661–62.

Starwalker appealed the rejection of its claims to the Board. Three merits-based questions relevant to this appeal were at issue in the Board proceeding: (1) whether the Contract's base-year language authorized payment for backhaul operations not directed on a mission sheet; (2) whether Starwalker was coerced into signing the contract modification; and (3) whether the statute of limitations had run for any of Starwalker's claims. The Board held a three-day hearing in July 2017.

In March 2020, the three-judge panel issued two decisions, both of which agreed on the outcome—Starwalker is not entitled to payment for backhaul—but differed in reasoning. *See Appeals of -- Starwalker PR LLC*, ASBCA Nos. 60485, 60755, 20-1 BCA ¶ 37551, 2020 WL 1557478, (Mar. 2, 2020) (*Board Opinion*) (J.A. 1–9).[3] Judge McIlmail, who led the proceedings, wrote that Starwalker's failure to raise quantum—i.e., the damages it contended it was owed—in its post-trial brief doomed its claim. *See id.* at 3. Judge Shackleford's opinion, joined by Judge Prouty,[4] considered

---

[3]    As the reported version of the Board Opinion is not paginated, the page references cited herein are to the opinion pages in the Joint Appendix.

[4]    The parties dispute whether Judge Shackleford's or Judge McIlmail's opinion reflects the majority. *See* Appellant's Br. 35–36; Appellee's Br. 13. We view Judge Shackleford's opinion as the majority as it was joined by Judge Prouty, Board Opinion at 9, and understand the titles of the respective opinions—the "Opinion" by Judge McIlmail and the "Concurring Opinion" by Judge

Starwalker's claim on the merits. *See id* at 5. That majority opinion determined that the base-year contract language unambiguously "lead[s] to the conclusion that backhaul is only paid when the government requests (through a Logistic Movement Request) that cargo be hauled from the delivery point to somewhere else in" Afghanistan. *Id.* at 8. It found no conflict between base-year § 4.10 and modified option year § 4.10, as modified § 4.10 "clarif[ied] what was already clear – backhaul is not payable unless requested by the [Government] by issuing an LMR/TMR." *Id.* Because the majority opinion's interpretation of the Contract was dispositive of Starwalker's appeal, it did not address whether the Government coerced Starwalker into agreeing to modify the Contract or whether any of Starwalker's claims were barred by the statute of limitations.

Starwalker timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

### DISCUSSION

We review the Board's interpretation of a Government contract *de novo*. *See* 41 U.S.C. § 7107(b)(1); *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1368 (Fed. Cir. 2009). "Construction of the language of the contract to determine whether there is an ambiguity is a question of law which we review without deference." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006). The Board's factual findings "shall be final and conclusive and shall not be set aside unless the decision is (A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence." 41 U.S.C. § 7107(b)(2)(A)–(C).

---

Shackleford—to reflect that Judge McIlmail was the lead judge for the proceeding.

This appeal requires us to determine whether the Contract unambiguously required the backhaul movement of trucks to be directed by the Government on an LMR or TMR to be compensable. As explained below, we agree with the Board that it did. Therefore, like the Board, we need not reach any factual issues pertaining to coercion or the Government's statute of limitations defense.

## A

"Contract interpretation begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "In contract interpretation, the plain and unambiguous meaning of a written agreement controls." *Hercules Inc. v. United States*, 292 F.3d 1378, 1380–81 (Fed. Cir. 2002) (quoting *Craft Mach. Works, Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir. 1991)). We must interpret a contract "in a manner that gives meaning to all of its provisions and makes sense," *Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)), and we seek to "avoid[] conflict or surplusage of [the contract's] provisions," *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (quoting *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)); *see also NVT Techs.*, 370 F.3d at 1159 (explaining that interpretations should "harmonize and give reasonable meaning" to all parts of the contract, rather than "leave[] a portion of the contract useless, inexplicable, void, or superfluous"). Contract provisions should not "be construed as being in conflict with [one] another unless no other reasonable interpretation is possible." *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965).

SOW §§ 1.3, 4.1, 4.2, and 4.10, and § E-1 of the Contract make clear that only movement directed by the Government—backhaul or otherwise—was compensable. Read together, §§ 1.3, 4.1, and 4.10 required Starwalker to

"comply with all movement requirements" (§ 1.3), such as transporting "equipment and resources . . . as indicated on" (§ 4.10) or "as directed on the official LMR/TMR" (§ 4.1). Most critically, § 4.10, the only contract provision that mentioned backhaul, explicitly tied "Backhaul Operations" to Government directed movement "as indicated on an official LMR/TMR." Section 4.2 and Appendix A priced services in terms of "mission days." J.A. 132–34, 175. When read in conjunction with § E-1, which permitted invoicing only for "days of actual service" and expressly precluded invoicing for "any event not directed by the Government," J.A. 136, the only reasonable interpretation of the Contract is that the Government could be invoiced only for movement that was directed on an LMR or TMR.

B

Starwalker's primary argument to the contrary is based on SOW § 4.11.1's mandate that mission sheets be returned to the Program Manager "upon mission completion." J.A. 179. Starwalker asserts that missions were not complete until the mission sheets were delivered to the Program Manager in Bagram, and thus return trips to Bagram were compensable as directed by the Government because they were part of the mission. *See, e.g.*, Appellant's Br. 42–56. Starwalker attempts to bolster its argument by pointing to language in § 4.10 requiring Starwalker to transport "resources" "associated with backhaul" per the Government's request. *See id.* at 47–48 (citing J.A. 179).

Starwalker's mission-sheet-based arguments are unpersuasive. First, Starwalker's contention that the return of mission sheets was compensable as part of the "mission" is based on a faulty reading of § 4.11.1, which states that the "[c]ontractor shall return all shipping documentation immediately to the PM *upon mission completion*." J.A. 179 (emphasis added). A plain reading of that sentence indicates that the mission is completed *prior* to the mission sheets being returned. And instead of directing us to a

contract provision supporting its contrary argument, Starwalker argues that the lack of an express definition for "mission completion" in the Contract renders it ambiguous. Oral Arg. 19:43–20:50. We disagree. Setting aside whether there is any ambiguity as to the precise moment a mission ended, the only reasonable reading of § 4.11.1 is that the return of the mission sheets occurs *after* mission completion.

Second, Starwalker's reliance on § 4.10 is misplaced. Even assuming *arguendo* that mission sheets are Government "resources" under § 4.10, that provision requires Starwalker to "pick up and deliver" such "resources associated with backhaul[ ] operations" "as indicated on an official LMR/TMR." J.A. 179. As the record is devoid of any LMR or TMR directing Starwalker to return mission sheets, § 4.10 provides Starwalker no reprieve.

Third, Starwalker fails to explain why, even if mission completion required the mission sheets to be returned to the Program Manager, *every truck* in a convoy had to individually return with its mission sheet. Starwalker asserts that "[a] single mission could frequently involve hundreds of cargo trucks with 50–100 security personnel." Appellant's Br. 17. If each truck carried its own mission sheet, then all § 4.11.1 required Starwalker to return to the Program Manager is a stack of mission sheets. Neither of Starwalker's briefs explains why it would require hundreds of trucks—or even a single truck—to do so. *See generally* Appellant's Br.; Appellee's Reply Br. 7–11 (asserting, without explanation, that return of each truck was required by § 4.11.1). Starwalker's explanation at oral argument was similarly lacking. It first claimed that "the instruction on the LMR/TMR itself is that the driver itself has to keep the mission sheet and then return to Bagram." Oral Arg. 8:22–9:10 (citing J.A. 2058). But the portions of the mission sheet cited by Starwalker say no such thing. The "instructions" cited by Starwalker only warn the "receiver" "not [to] keep the original mission sheet" and that the sheet is the

"carrier's proof of mission completion." J.A. 2058. Nowhere do the mission sheets instruct individual drivers to keep them, personally return them, or require them to be returned in the vehicle that made the delivery. *See id.* On its second try, Starwalker simply stated, again without explanation, that the "realities of what was going on in Afghanistan in 2009 and 2010" created a situation where "there was no feasible way to return these other than that." Oral Arg. 9:10–9:58. Given the straightforward understanding of the contract as a whole, as explained above, we are left without any basis to adopt Starwalker's interpretation of § 4.11.1.

C

Starwalker's remaining arguments premised on the Q&A and the invoicing clause are similarly unavailing. Contrary to what Starwalker implies, Q&A 34 did not address backhaul in the abstract. *See* Appellant's Br. 48–53. Instead, it referred to "retrograde/backhaul operations" in the context of § 4.10. *See* J.A. 635. Thus, the only reasonable interpretation of Q&A 34 is that, when the Government stated that backhaul "will be counted in accordance with SOW para 4.2," *see id.*, it was stating that any backhaul operations "indicated on an official LMR/TMR" would be counted as mission days according to § 4.2. As to § E-1, the invoicing clause, we determined above that the return of the mission sheets via individual trucks was not directed by the Government. Thus, there was no need for the Government to explicitly list backhaul as a non-compensable activity. Section E-1's prohibition on invoicing for "any event not directed by the Government" already clarified that such movement not directed on an LMR or TMR was not compensable. And as we find no ambiguity in the base-year contract language, we agree with the Board majority opinion that the modification clarified the original intent of the Contract.

CONCLUSION

We have considered Starwalker's remaining arguments and find them unpersuasive. For the foregoing reasons, the decision of the Board is affirmed.

**AFFIRMED**